ALLEN *et al.* v. TRIMMER, *County Treasurer.*

No. 4806.   Opinion Filed November 17, 1914.   Dissenting Opinion, December 22, 1914.

(144 Pac. 795.)

TAXATION—Property Subject—Allotments.   Lands allotted to freedmen of the Chickasaw Nation by virtue of the provisions of the Act of Congress of July 1, 1902, c. 1362, 32 Stat. 641, are subject to taxation under the laws of the State of Oklahoma.

(Syllabus by the Court.)

Kane, C. J., and Turner, J., dissenting.

*Error from District Court, Garvin County;*

*R. McMillan, Judge.*

Action by Stephen W. Allen and others against J. F. Trimmer, Treasurer of Garvin County.   Judgment for defendant and plaintiffs bring error.   Affirmed.

*W. R. Wallace* and *Albert Rennie,* for plaintiffs in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for defendant in error.

BLEAKMORE, J.     Plaintiffs in error, plaintiffs below, began this action in the trial court to restrain the collection of taxes for the years 1909, 1910, 1911, and 1912 upon lands allotted to them from the public domain of the Chickasaw Nation as Chickasaw freedmen, claiming that said lands were exempt from taxation by virtue of the provisions of laws under which said allotments were made. To review the judgment of the trial court sustaining a demurrer to their petition, this proceeding in error is prosecuted.

These plaintiffs are the former slaves of the Chickasaws and their descendants. All their rights to the lands allotted to them were acquired under the provisions of certain agreements between the United States and the Choctaw and Chickasaw Tribes of Indians and congressional acts relative to such tribes and their lands.

Determination of the sole question involved—are the lands allotted to Chickasaw freedmen exempt from taxation—requires an examination of such treaties and laws; and lengthy quotations therefrom will necessarily be made.

The treaty between the United States and these tribes proclaimed July 10, 1866 (14 Stat. 769), after declaring that slavery should never exist in said nations, provides:

"Article III. The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the 98° west longitude, known as the leased district, provided that the said sum shall be invested and held by the United States, at an interest not less than five per cent, in trust for the said nations, until the legislatures of the Choctaw and Chickasaw Nations respectively shall have made such laws, rules and regulations as may be necessary to give all persons of African descent, resident in said nations at the date

of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys, and public domain claimed by, or belonging to, said nations respectively; and also to give to such persons who were residents as aforesaid, and their descendants, forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said land, after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided; and immediately on the enactment of such laws, rules, and regulations, the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw Nations in the proportion of three-fourths to the former and one-fourth to the latter,—less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to as within ninety days after the passage of such laws, rules, and regulations shall elect to remove and actually remove from the said nations respectively. And should the said laws, rules, and regulations not be made by the legislatures of the said nations respectively, within two years from the ratification of this treaty, then the said sum of three hundred thousand dollars shall cease to be held in trust for the said Choctaw and Chickasaw Nations, and be held for the use and benefit of such of said persons of African descent as the United States shall remove from the said territory in such manner as the United States shall deem proper,—the United States agreeing, within ninety days from the expiration of the said two years to remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed from said nations to have no benefit of said sum of three hundred thousand dollars, or any part thereof, but shall be upon the same footing as other citizens of the United States in the said nations."

Prior to 1897 various acts were passed by the Chickasaw Legislature relative to their freedmen, pursuant to the treaty of 1866, *supra,* none of which became effective, not being approved by the proper authority of the United States, and therefore have no important bearing on the question here involved.

By section 29 of the agreement between the United States and

the Choctaw and Chickasaw Tribes of Indians of date April 23, 1897, and ratified and confirmed by the act of June 28, 1898 (known as the Atoka Agreement, 30 Stat. 505, c. 517), it is provided:

"That all the lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes so as to give each member of these tribes so far as possible a fair and equal share thereof, considering the character and fertility of the soil and the location and value of the lands. * * *

"That the Commission to the Five Civilized Tribes shall make a correct roll of Chickasaw freedmen entitled to any rights or benefits under the treaty made in eighteen hundred and sixty-six between the United States and the Choctaw and Chickasaw Tribes and their descendants born to them since the date of said treaty, and forty acres of land, including their present residences and improvements, shall be allotted to each, to be selected, held, and used by them until their rights under said treaty shall be determined, in such manner as shall hereafter be provided by act of Congress.

"That the lands allotted to the Choctaw and Chickasaw freedmen are to be deducted from the portion to be allotted under this agreement to the members of the Choctaw and Chickasaw Tribes so as to reduce the allotment to the Choctaws and Chickasaws by the value of the same.

"That the said Choctaw and Chickasaw freedmen who may be entitled to allotments of forty acres each shall be entitled each to land equal in value to forty acres of the average land of the two nations. * * *

"All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of patent. This provision shall also apply to the Choctaw and Chickasaw freedmen to the extent of his allotment. Selections for homesteads for minors to be made as provided herein in case of allotment, and the remainder of the lands allotted to said members shall be alienable for a price to be

actually paid, and to include no former indebtedness or obligation—one-fourth of said remainder in one year, one-fourth in three years, and the balance of said alienable lands in five years from the date of the patent."

By the terms of the agreement between the United States and the Choctaw and Chickasaw Nations, made on the 21st of March, 1902, and ratified and confirmed by the act of July 1, 1902, c. 1362, 32 Stat. 641, known as the "Supplemental Agreement," it is further provided:

"There shall be allotted to each member of the Choctaw and Chickasaw Tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allottable land of the Choctaw and Chickasaw Nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after the approval by the Secretary of the Interior of his enrollment, land equal in value to forty acres of the average allottable land of the Choctaw and Chickasaw Nations; to conform, as nearly as may be, to the areas and boundaries established by the government survey, which land may be selected by each allottee so as to include his improvements.   *   *   *

"13.   The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment.   *   *   *

"15.   Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided."

The same agreement provides as follows:

"36.   Authority is hereby conferred upon the Court of Claims to determine the existing controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw and Chickasaw Nations under the third article of the treaty of eighteen hundred

and sixty-six, between the United States and the Choctaw and Chickasaw Nations, and under any and all laws subsequently enacted by the Chickasaw Legislature or by Congress.

"37. To that end the Attorney General of the United States is hereby directed, on behalf of the United States, to file in said Court of Claims, within sixty days after this agreement becomes effective, a bill of interpleader against the Choctaw and Chickasaw Nations and the Chickasaw freedmen setting forth the existing controversy between the Chickasaw Nation and the Chickasaw freedmen and praying that the defendants thereto be required to interplead and settle their respective rights in such suit. * * *

"39. The Choctaw and Chickasaw Nations, respectively, may in the manner prescribed in sections twenty-one hundred and three to twenty-one hundred and six, both inclusive, of the Revised Statutes, employ counsel to represent them in such suits and protect their interests therein; *and the Secretary of the Interior shall employ competent counsel to represent the Chickasaw freedmen in said suit and to protect their interests therein; and the compensation of counsel so employed for the Chickasaw freedmen, including all costs of printing their briefs and other incidental expenses on their part, not exceeding six thousand dollars, shall be paid out of the Treasury of the United States.* * * *

"40. In the meantime the Commission to the Five Civilized Tribes shall make a roll of the Chickasaw freedmen and their descendants, *as provided in the Atoka Agreement, and shall make allotments to them as provided in this agreement,* which said allotments shall be held by the said Chickasaw freedmen, not as temporary allotments, but as final allotments, and in the event that it shall be finally determined in said suit that the Chickasaw freedmen are not, independently of this agreement, entitled to allotments in the Choctaw and Chickasaw lands, the Court of Claims shall render a decree in favor of the Choctaw and Chickasaw Nations according to their respective interests, and against the United States, for the value of the lands so allotted to the Chickasaw freedmen as ascertained by the appraisal thereof made by the Commission to the Five Civilized Tribes for the purpose of allotment, which decree shall take the place of the said lands and shall be in full satisfaction of all claims by the Choctaw and Chickasaw Nations against the United States or the said freedmen on account of the taking of the said lands for allotment to

said freedmen: Provided, that nothing contained in this paragraph shall be construed to affect or change the existing status or rights of the two tribes as between themselves respecting the lands taken for allotment to freedmen, or the money, if any, recovered as compensation therefor, as aforesaid."

In the case of *United States v. Choctaw Nation et al.*, 38 Ct. Cl. 558 (the action provided for under the terms of the act of July 1, 1902, *supra,*) the Court of Claims, after quoting the provisions of the treaties and acts of Congress above set forth, used this language:

There is apparent reason to say that by the agreement and act of June 28, 1898 (30 Stat. 506), the previous act of Congress, by which the act of adoption was approved, was ratified by the Chickasaw Nation, wherein it is provided that the commission shall make a correct roll of the freedmen entitled to any rights under the treaty in question, and that 40 acres of land, including their present residence and improvements, shall be allotted to each of them and such lands so allotted to the freedmen to be deducted, so as to reduce the allotment to the Indians by the value of the same. This allotment to the freedmen is, however, qualified by the further provision that the lands so allotted shall be held and used by the freedmen until their rights under the treaty shall be determined, in such manner as shall thereafter be provided by Congress. This provision could not refer to anything but the then existing and now present controversy, and was a direct recognition by Congress of the denial of the rights of the freedmen to the lands then proposed to be allotted to them, and an express saving of the rights of the Chickasaw defendant to insist upon its present contention in that respect; and by the act of March, 1902, Congress did provide for the determination of the rights of the freedmen under the treaty, as portended in the act of June 28, 1898. It follows therefore that the rights of the parties under article 3 of the treaty of July 10, 1866, remain unaffected by subsequent legislation, either of the Chickasaw Nation or Congress, and the relations of the Chickasaw freedmen to the Chickasaw Nation, and the rights of such freedmen in the lands of the Choctaw and Chickasaw Nations under the third article of the treaty in question are to be determined and declared according to its terms."

Again it is held in said opinion:

"The Chickasaws have not, as has already been stated, adopted the freedmen into their nation. The negroes have remained in the nation. It does not appear they, or any of them, were willing to remove from the nation, and the United States, not having obligated itself to do so, was under no duty to remove them without their consent. We must presume the freedmen voluntarily remained, and still so remain in the nations. Their status is therefore plainly defined by the treaty itself. Their relation to the Chickasaw Nation is, as the treaty expresses, the same as citizens of the United States in the nation, and that being true, they have no right or interest, under the terms of the treaty, independently of the agreement of March 21, 1902, in any of the property held in common by the members of the nation. Neither are those of the freedmen who remain within the nation entitled to any part of the funds in the control of the United States."

In the decree of the Court of Claims in said case it is held:

"It is therefore ordered, adjudged, decreed, and declared by the court that, under and by virtue of the third article of the said treaty of July 10, 1866, independently of the agreement made March 2, 1902, and ratified and confirmed July 1, 1902, the relations of the said Chickasaw freedmen to the Chickasaw Nation are that of citizens of the United States residing in the said nation, and that the said Chickasaw freedmen, under the said article of the said treaty, independently of the agreement and act aforesaid of 1902, have no rights in the lands of the Chickasaw Nation, nor are they, or any of them, under said article, entitled to allotments in the lands of the said Chickasaw Nation."

On appeal to the Supreme Court of the United States, in said case (*United States v. Choctaw Nation et al.*, 193 U. S. 115, 24 Sup. Ct. 411, 48 L. Ed. 640), that court, after quoting at length from the agreements and statutes herein referred to and the decree of the Court of Claims, uses the following language:

"It is urged that the negroes became free by the emancipation proclamation and the thirteenth amendment to the Constitution of the United States, and acquired thereby all the rights of freedmen. That may be granted, but what is its consequence? Certainly not to invest the freedmen with any rights in the prop-

erty, or to participate in the affairs of their former owners. For such rights we must look to the treaty and subsequent legislation and, to a certain extent, to the act which gave jurisdiction of this suit to the Court of Claims. * * *

"The treaty is clear. The Indian nations were to receive the $300,000 if they conferred upon the freedmen the rights expressed in the treaty. Failing to confer those rights, that sum was to be held in trust for all such freedmen, and only such freedmen, as should remove from the territory. *The treaty was not complied with either by the Indians or the United States. No rights were conferred upon the freedmen; no freedmen were removed,* and the statutes were enacted and the agreements were made that we have described. *But those statutes and the agreements gave no rights to the freedmen. The only explicit provision for the freedmen was the allotment of 40 acres of land to each of them.* They claim to be beneficiaries of the $300,000, but the disposition of that under the treaty was to be in the United States, and only to be used for freedmen who should remove from the territory. None have removed. There is an intimation in the brief of their counsel that in their memorials to Congress they expressed a willingness to remove, but Congress did not choose, and has not chosen, to remove them; indeed, had provided for the exact opposite—provided for the allotment of homes to them out of the lands of the Indians, and for payment to the Indians therefor if it should be determined, in this suit, *that the freedmen were not, independently of that agreement, 'entitled to allotments in the Choctaw and Chickasaw lands.'*

"As we hold the freedmen were not so entitled, the decree of the Court of Claims is affirmed."

By Act of Congress of May 27, 1908 (35 Stat. 312, c. 199), it is provided:

"That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions."

By section 4 of said act it is further provided:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

Plaintiffs contend that the lands allotted to them are exempt from taxation by virtue of the provisions of the Atoka Agreement that:

"All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of patent. This provision shall also apply to the Choctaw and Chickasaw freedmen to the extent of his allotments."

It is asserted that the plaintiffs are upon an equality with, and possess the same rights and immunities with regard to their lands as do Indians; that the grant to them of nontaxable lands is the same as that to the Choctaw and Chickasaw Indian allottees, founded upon the same treaty stipulations, and, if consideration is necessary, upon the same consideration. It is claimed that the holding of the United States Supreme Court in the case of *Choate v. Trapp*, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, is decisive of the question favorable to this contention. In that case the court, after a resume of the treaty provisions, says:

"The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States.

"The individual Indian had no title or enforceable right in the tribal property. But as one of those entitled to occupy the land he did have an equitable interest, which Congress recognized, and which it desired to have satisfied and extinguished. The Curtis Act was framed with a view of having every such claim satisfactorily settled. And although it provided for a division of the land in severalty, *if offered a patent of nontaxable land only to those who would relinquish their claim in the other property of*

*the tribe formerly held for their common use.* For the Atoka (Agreement, after declaring that 'all land allotted should be non-taxable,' stipulated further that each enrolled member of the tribes should receive a patent framed in conformity with the agreement, and that each Choctaw and Chickasaw who accepted such patent should be held thereby to assent to the terms of this agreement, and to relinquish all of his right in the property formerly held in common.

"There was here, then, an offer of nontaxable land. Acceptance by the party to whom the offer was made, with consequent relinquishment of all claim to other lands, furnished a part of the consideration, if, indeed, any was needed, in such a case, to support either the grant or the exemption. *Wisconsin & M. R. Co. v. Powers,* 191 U. S. 386, 24 Sup. Ct. 107, 48 L. Ed. 231; *Home of the Friendless v. Rouse,* 8 Wall. 437, 19 L. Ed. 497; *Tomlinson v. Jessup,* 15 Wall. 458, 21 L. Ed. 205. Upon delivery of the patent the agreement was executed, and the Indian was thereby vested with all the right conveyed by the patent, and, like a grantee in a deed poll, or a person accepting the benefit of a conveyance, bound by its terms, although it was not actually signed by him. *Keller v. Ashford,* 133 U. S. 621, 10 Sup. Ct. 494, 33 L. Ed. 672; *Hendrick v. Lindsay,* 93 U. S. 143, 23 L. Ed. 855.

"As the plaintiffs were offered the allotments on the conditions proposed, as they accepted the terms and, in the relinquishment of their claim, furnished a consideration which was sufficient to entitle them to enforce whatever rights were conferred, we are brought to a consideration of the question as to what those rights were."

From the language used in the Trapp case, it will be seen that plaintiffs' claim that the grant to the freedmen of nontaxable land was by the terms of the Atoka Agreement made to them the same as to the Indian allottees is untenable. The freedmen did not have an equitable interest in the tribal property. They had no lawful claim to any of the lands or property of the tribe which it was necessary to satisfy or extinguish. The offer of a patent of nontaxable land being made "only to those who would relinquish their claim in the other property of the tribe formerly

held for their common use" was not extended to these freedmen, and could not have included them. They were not embraced within the class of persons who could accept such offer by relinquishing any right in the property of the tribe formerly held in common. They had no such right. As was held by the Court of Claims:

"Their (the Chickasaw freedmen) relation to the Chickasaw Nation is, as the treaty expresses, the same as citizens of the United States in the nation, and, that being true, they have no right or interest, under the terms of the treaty, independently of the agreement of March 21, 1902, in any of the property held in common by the members of the nation." And "that the rights of the parties (the Chickasaw freedmen) under article 3 of the treaty of July 10, 1866, remain unaffected by subsequent legislation, either of the Chickasaw Nation or Congress."

The freedmen were not parties to any treaty between the United States and the Indian tribes; and no provision contained in any agreement between the United States and the Choctaw and Chickasaw Tribes was ever carried into effect by which any rights were conferred upon, or property vested in, such freedmen, save alone by the provisions for allotment of lands to them contained in the Supplemental Agreement of 1902.

Had the supplemental treaty of 1902 provided for judicial determination of the rights of such freedmen, as it did, and failed to provide for allotments of land to them, the decision of the Court of Claims, *supra*, would have left them without land, and certainly without their present claim of tax exemption.

The liberal rule of construction recognized by the courts, whereby the language used in treaties and laws dealing with the affairs of Indians is never construed to their prejudice, but, if doubtful, in their favor, finds no place in the law where only the rights of persons other than Indians are to be considered.

According to the terms of the Atoka Agreement, all lands allotted to members of the tribes shall be nontaxable for a speci-

fied period while the title remains in the original allottee; and "this provision shall also apply to the Choctaw and Chickasaw freedmen to the extent of his allotment." What was the extent of his allotment under the terms of that agreement? It is therein provided that:

"Forty acres of land including their present residences and improvements, shall be allotted to each, to be selected, held, and used by them until their rights under said treaty (1866) shall be determined, in such manner as shall hereafter be provided by Act of Congress."

Clearly the extent of this proposed allotment to the freedmen was only the right to hold and use 40 acres of land dependent upon the future action of Congress. No title to such land vested in the freedmen by virtue of this provision; nor, indeed, is it urged that it was intended thereby to convey the title to such lands.

It would require a most unnatural construction of the terms of the Atoka Agreement to hold that it was the intention of Congress to extend the grant of tax exemption therein made to allotments other than those it contemplated and provided for. Had subsequent legislation enlarged upon the same grant of lands made to the freedmen by the Atoka Agreement, and had allotments actually been made to them thereunder (such as were made to Indian allottees), then it might with reason be said that the tax exemption granted by the terms of said agreement was continued and extended so as to embrace freedmen allotments. But no allotments were made to freedmen under the Atoka Agreement. Such allotments were made under the terms of, and "as provided" in, the Supplemental Agreement. The allotments to freedmen under the provisions of the Supplemental Agreement were to an entirely different class of allottees than those contemplated by the Atoka Agreement. The freedmen allottees referred to in the Atoka Agreement are those who possessed rights to the Indian lands under the treaty of 1866. The freedmen provided for under the

Supplemental Agreement are allottees to whom lands are given thereby regardless of their right under any other treaty or law. The tenure of the lands granted by the two agreements is entirely different. By the Atoka Agreement there is granted a mere tenancy at the will of Congress; by the Supplemental Agreement title in fee simple.

The Supplemental Agreement made no provision for allotments to members of the Choctaw and Chickasaw Tribes of Indians under a status different from that occupied by them under the terms of the Atoka Agreement. "As members of the tribe," they were entitled to share in the tribal lands. Not so with the freedmen. Under the Atoka Agreement Chickasaw freedmen were to have temporary allotments of land, the title to which depended solely upon the future determination of the question as to whether they had theretofore been adopted by the Chickasaws pursuant to the provisions of the treaty of 1866. By the terms of the Supplemental Agreement a new and entirely different condition as to the Chickasaw freedmen was created. Allotments were to be made to them regardless of their adoption by the Indians or their rights under any former treaty or law; that question being referred to the appropriate court for determination. Had allotments been made to these freedmen under the terms of the Atoka Agreement, "to be held and used by them until their rights under the treaty of 1866 was determined," all their right, title, and interest in and to the lands allotted to them would have been divested by the decision of the Court of Claims. Except for the Supplemental Agreement of 1902, they would have occupied the same status as other United States citizens resident in the Chickasaw Nation, for whom no allotment of land has been provided. The sole right of these plaintiffs to allotments of land in the Chickasaw Nation being acquired by the provisions of the Supplemental Agreement, we must look alone to its terms for the exemption claimed. Nowhere in said act is there found, either by express language, or necessary implication, a grant of exemp-

tion from taxation; nor do plaintiffs assert that such grant was made under any provision of that act.

Under the terms of the Supplemental Agreement, the only authority of the Commission to the Five Civilized Tribes with reference to Chickasaw freedmen was to make a roll or census of them as provided in the Atoka Agreement, "and to make allotments of land to them as provided in the Supplemental Agreement." The Supplemental Agreement was ratified and confirmed by the tribes on September 25, 1902; but no allotments were made to either Indians or freedmen until April, 1903.

The Supreme Court of the United States having said in *Choate v. Trapp, supra,* that "the question in this case, therefore, is not whether the plaintiffs (Choctaw and Chickasaw Indians) were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States," and the Court of Claims in determining the controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw and Chickasaw Nations under the third article of the treaty of 1866, subsequent treaties and laws, having held that "such freedmen, independently of the Supplemental Agreement of 1902, were not entitled to allotments in the Choctaw and Chickasaw lands," it necessarily follows that these freedmen are precluded from asserting any right, title, or interest in or to their allotted lands under or by virtue of the Curtis Act or any treaty or law other than the said Supplemental Agreement. The decision of the Court of Claims, affirmed by the Supreme Court of the United States, conclusively determines the status and rights of the Chickasaw freedmen, and is binding on the courts of this state.

The rule is well established that, where land is granted by a particular act, a tax exemption asserted under a prior act will not be upheld. *Armstrong v. Treasurer of Athens County,* 16 Pet. 281, 10 L. Ed. 965; *Lord v. Town of Litchfield,* 36 Conn.
Form 4

117, 4 Am. Rep. 41; *Southwestern R. R. Co. v. Wright,* 116 U. S. 231, 6 Sup. Ct. 375, 29 L. Ed. 626; *Wilmington & Weldon R. R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972; *Ford v. Delta & Pine Land Co.,* 164 U. S. 662, 17 Sup. Ct. 230, 41 L. Ed. 590; *Platt v. Rice,* 10 Watts (Pa.) 352.

It is also claimed that, as a consideration for obtaining a nontaxable grant of land, these freedmen, as potential taxpayers, by the terms of the Supplemental Agreement, were induced to expend their money in the litigation therein provided for in the Court of Claims.

Not so. In that litigation the fees of their counsel, all costs, and the incidental expenses were paid out of the treasury of the United States. But even if the purpose of such litigation was to determine whether these freedmen should obtain a nontaxable grant of land, the adverse decision of the Court of Claims would render their contention untenable.

It is a well-established rule that a grant of exemption from taxation is never presumed; but, on the contrary, in all cases of doubt as to the legislative intent (except, perhaps, where the rights of Indians are involved), the presumption is in favor of the taxing power. *Wells c. Savannah,* 181 U. S. 531, 21 Sup. Ct. 697, 45 L. Ed. 986; *Tucker v. Ferguson,* 22 Wall. 527, 22 L. Ed. 805; *Delaware Railroad Tax Case,* 18 Wall. 206, 21 L. Ed. 888; *Hoge v. Railway Co.,* 99 U. S. 348, 25 L. Ed. 303; *Vicksburg R. R. Co. v. Dennis,* 116 U. S. 665, 6 Sup. Ct. 625, 29 L. Ed. 770; *Pickard v. Tennessee,* 130 U. S. 637, 9 Sup. Ct. 640, 32 L Ed. 1051; *Wilmington, etc., R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972.

In view of the foregoing, we conclude that no grant of exemption from taxation was extended or made to plaintiffs in error, and therefore the judgment of the trial court should be affirmed, and it is so ordered.

LOOFBOURROW and RIDDLE, JJ., concur. KANE, C. J., and TURNER, J., dissent.

RIDDLE, J.  I concur in the reasoning and conclusion in the majority opinion of the court, written by Associate Justice BLEAKMORE, and I am of the opinion that the judgment of the trial court is sound and should be affirmed for another reason, other than stated in the opinion, which, in my judgment, is equally sound.  While it is clear these freedmen had no right to allotments, except under the Supplemental Agreement, ratified September 25, 1902, yet if there is a reasonable doubt as to whether or not there lands are exempt from taxation, by a well-settled rule, such doubt should be solved in favor of the state. Conceding that they were entitled to the exemption from taxation under section 29 of the Atoka Agreement, so long as the same remained unrepealed, it cannot be doubted that Congress has expressly repealed this exemption, so far as applies to all lands upon which restrictions have been removed.  It is admitted that restrictions upon the alienation of lands allotted to these freedmen have been removed.  Congress having undertaken to repeal this exemption, the question arises: Did it have the power so to do?  We are cited to the cases of *Choate v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, and *New Jersey v. Wilson,* 7 Cranch, 164, 3 L. Ed. 303, and other cases, as holding that neither Congress nor the state has power to repeal the exemption.  In my judgment, these cases are not in point.

There is a marked distinction between the status of the members of the Chickasaw Tribe of Indians and these freedmen in their relation to the federal government.  The fee-simple title to the lands of this nation was vested jointly in the Choctaw and Chckasaw Tribes of Indians, while the individual allottee, prior to the division of the property, had no title in the lands which he could convey or enforce, yet he did have an equitable interest, a property right, which Congress could not destroy or divest; and as held by the Supreme Court in *Choate v. Trapp, supra,* in the

Curtis Act and the Atoka Agreement, Congress formulated a plan to divide this property, and tendered to each individual member of the tribe a patent, conveying to him his share of these lands and exempting the same from taxation for a certain period, upon condition that the acceptance of this patent by the allottee should be a consent upon his part to relinquish all the right, title, and interest which he had by virtue of his membership in the tribe to the balance of the tribal lands. This right and interest was, beyond doubt, a property right, a vested right; and by virtue of this agreement, having relinquished this interest, it constituted a valid contract between the tribe and its members on the one hand and the federal government on the other. When this state was admitted into the Union, by section 3 of the Constitution, the people of the state agreed that all public lands belonging to any of said Indian tribes or nations should not be taxed until the title should be extinguished by the United States. By virtue of section 45, art. 25, of the Constitution, the people of the state did, by an irrevocable ordinance, accept the terms and conditions of the Enabling Act; and by a provision of said act it is provided that the government reserves the right to legalize relative to the Indian tribes and their tribal property. This right to so legislate was, by the state, surrendered to the federal government. The freedmen occupy an entirely different relation toward the federal government and the state than did the members of this tribe of Indians. Under the provisions of the treaty of 1866, their status, so far as any right to any of the tribal property, remained the same as the white citizens. They were subject to removal by the federal government. In other words, they remained here only by the sufferance of the federal government and the Indian tribes. They had no interest in the tribal property, either present, contingent, or future. *United States v. Choctaw Nation et al.*, 193 U. S. 115, 24 Sup. Ct. 411, 48 L. Ed. 640.

The fact that the government purchased from the tribe and donated 40 acres of land to each of these freedmen did not in any

sense constitute a valid contract, existing between the government and such freedmen. It was a mere bounty, bestowed upon these people by the government. The freedmen paid nothing; they took no chances; they relinquished no rights, for such they had not. The ward must pay the expense of litigation to recover or to protect his property; but every dollar of expense of litigation was paid by the government for these freedmen, even to the recording of the patent to their land. Their status was one of waiting and watchng with no uncertainty as to the result, for the government had graciously said, if you have no rights a court of equity can recognize, yet for fear of some moral obligation which has not been strictly complied with, the government as guardian of these Indians has purchased and will, without money or price, deed to each 40 acres. It was not indispensable for a consideration to pass from him to the federal government, to constitute a valid conveyance of the title to the 40 acres; neither was it indispensable that a consideration should pass in order to exempt said lands from taxation; but certainly the fact that Congress saw fit to exempt his land from taxation, without any consideration, would estop it from removing the exemption at its pleasure. In every case where the Supreme Court of the United States has held that the Legislature was without power to repeal a tax excxemption it has been upon the theory that the act of the legislature granting the exemption constituted a valid contract or property right between the parties; and on the other hand, in every case decided by that court, where it has been held that the act granting the exemption constituted no contract, the power to repeal the exemption has been upheld. It cannot be doubted, in order to constitute such legislation, a valid contract, there must be a valid consideration. Cooley on Tax. p. 111; 37 Cyc. 901.

37 Cyc. p. 901, speaking upon this subject says:

"Such a grant, if plainly expressed and distinctly contractual in its nature and founded upon a consideration, constitutes a

binding and irrevocable obligation on the part of the state"—citing *University v. People*, 99 U. S. 309, 25 L. Ed. 387; *Jefferson Branch Bank v. Skelly*, 1 Black, 436, 17 L. Ed. 173; *Wells v. Savannah*, 181 U. S. 531, 21 Sup. Ct. 697, 45 L. Ed. 986.

In the case of *Grand Lodge v. New Orleans*, 166 U. S. 143, 17 Sup. Ct. 523, 41 L. Ed. 951, it is said:

"We are of opinion that the act in question in this case was one which the Legislature might properly enact as a matter of public policy, and in aid of a beneficent purpose; but that it was a mere gratuity or bounty which it was competent at any time to terminate, and that this was done by article 207 of the Constitution of 1879. * * *. So, in * * * *West Wisconsin Railway v. Board of Supervisors*, 93 U. S. 595 [23 L. Ed. 814], is was held that an act of the Legislature exempting property of all railroads from taxation was not a contract to exempt, unless there were a consideration for the act; that the promise of a gratuity, spontaneously made, may be kept, changed, or recalled at pleasure; and that this rule applied to the agreements of the states, made without consideration, as well as to those of persons."

See also, *Newton v. Commissioners*, 100 U. S. 548, 25 L. Ed. 710; *People v. Roper*, 35 N. Y. 629. In *Welch v. Cook*, 97 U. S. 541, 24 L. Ed. 1112, the act of the legislative assembly of the District of Columbia of June 26, 1873, exempted from general taxes for ten years thereafter such real and personal property as might be actually employed within the district for manufacturing purposes. It was held that the language did not create an irrepealable contract with the owners of such property, but simply conferred a bounty, liable at any time to be withdrawn. See *Rector & C. of Christ Church v. Philadelphia*, 24 How. 300, 16 L. Ed. 602.

It is clear to my mind that, if the federal government had granted the exemption as contended, it was not an appurtenance to the land, but simply a personal privilege, without consideration, and repealable at the pleasure of Congress. That these people occupied no more favorable status legally toward the

Chickasaw Nation than other noncitizens is clear from the provisions of the act of 1866, as construed by the Supreme Court of the United States in the case of *United States v. Choctaw Nation, et al., supra.* Had the federal government, being actuated by some beneficent motive, purchased a portion of this land from the Choctaw and Chickasaw Nations and bestowed it upon a certain class of noncitizens and provided it should be exempt from taxation for a period of twenty years, we think it could not be questioned that Congress could thereafter repeal so much of the act granting the exemption from taxation at its pleasure. The federal government, actuated by a philanthropic motive and perhaps recognizing a moral obligation from the Chickasaw Tribe of Indians due its freedmen which the tribe failed to observe and carrying out its unbroken policy of fairness, made a gratuitous gift of 40 acres of land each to these freedmen, thereby apparently favoring them over the other citizens of the state. In adopting the Constitution, the state agreed to keep inviolate all the rights in favor of Indian tribes existing by virtue of their treaties with the government; but the federal government did not require the state to favor these freedmen over its other citizens. Neither did the state agree to favor them. The state did agree to extend to them the equal protection of the law, and that it must do, but is under no obligation to grant a privilege to them in the way of immunity from taxation. In extending to them the equal protection of the law, it is only then just and right that they be required to contribute in proportion to their wealth the expense of maintaining the government which furnishes this protection. If the exemption was ever granted, it was on this consideration of the government's policy of fairness; and, being freely granted, it may as freely be recalled, when the legislative view of public policy may have changed, and the needs of the state demanded. 'As a matter of law, they must be regarded as favors or privileges to this class, granted and to be held at the pleasure of the sovereign power. There was no pledge by the government that they should be permanent, and no demand on the state to so regard and treat it as such, and no wrong done when they are recalled.

I am therefore of the opinion that there was no contract existing between the federal government and these freedmen, exempting their lands from taxation, such as to vest in them a property right in such exemption as would preclude Congress from repealing it at pleasure; that the conveyance of the 40 acres of land was merely a bounty, and there being no consideration for the exemption from taxation, Congress could repeal it at pleasure; that Congress has expressly repealed that portion of the agreement exempting lands from taxation, so far as applied to lands upon which restrictions have been removed, including the lands allotted to these freedmen, must be admitted.

TURNER, J. (dissenting). I know no way to better express by dissent to the foregoing opinion that to file this, the opinion originally adopted by the court in this cause. These petitioners, plaintiffs below, are Chickasaw freedmen, and as such are each the owner of 40 acres of land in Garvin county, allotted and patented to them pursuant to Act July 1, 1902 (chapter 1362, 32 Stat. 641), and pursuant to the terms of the Curtis Act (Act June 28, 1898, 30 Stat. 507, c. 517). Subsequent to their allotment, Congress on May 27, 1908 (35 Stat. 312, c. 199) passed an act removing restrictions from the sale and incumbrance of land held by freedmen allottees, and providing that lands from which restrictions had been removed should be subject to taxation. After that, these lands were assessed for taxes for 1909, 1910, 1911, and 1912, and when defendant, as county treasurer of said county, advertised the same for sale for their nonpayment, this suit was brought to restrain him. From a judgment sustaining a demurrer to their petition, plaintiffs bring the case here.

The sole question involved is whether these lands are exempt from taxation, as claimed by petitioners. Prior to the Emancipation Proclamation (January 1, 1863), petitioners were held in bondage by the Chickasaws. That proclamation made them citizens of the United States. During the Civil War the Chicka-

saws abjured their allegiance to the United States and allied themselves to the Confederate States of America. At its termination, the United States, looking to the best interest of all concerned, including the Chickasaw and his freedmen, made a treaty with the Chickasaws and other Indian trbes, known as the Treaty of 1866 (14 Stat. 769). Pertinent to this inquiry, article 3 of the treaty, in effect, provided that the United States should hold, for the Choctaws and Chickasaws, $300,000 belonging to them in trust until, within a certain time, their respective Legislatures should make certain provisions necessary to give "all persons of Afrcan descent," resident of those Nations at a certain time, "and their descendants heretofore held in slavery among said Nations" (which included petitioners), among other things, "40 acres each of the lands of said Nation" on equal terms with the Choctaws and Chickasaws. The article further provided that, failing to make such provision within that time, said $300,000 would cease to be so held, but would be held in trust for such of said freedmen as would remove from said territory, those remaining or returning after having been removed to have no benefit in said sum," but shall be upon the same footing as other citizens of the United States in said Nations." It is sufficient to say of this article that there was nothing done pursuant thereto to vest in the freedmen any right to said 40 acres until the passage of the Curtis Act. In the meantime, and shortly after the ratification of said treaty (that is, on November 9, 1866, and again in 1868), the Chickasaws, who deeply resented the imposition of those terms of the treaty, by act of their Legislature declared it to be their unanimous desire that the United States hold their share of said $300,000 in trust for said freedmen and remove them from said Nation. But the freedmen continued to remain and occupy the lands of the Chickasaws, claiming a right so to do under said treaty. Apparently despairing of their removal, said Legislature, on January 10, 1883, passed another act providing, in effect, for the adoption of said freedmen into the tribe, under certain restrictions, with the privilege

only to take said "40 acres per capita provided for in the third article of the treaty of 1866"—the act to take effect on approval of the United States.    It is sufficient to say of this act that before the same was approved, as was later attempted by Congress (Act Aug. 15, 1894, sec. 18), it was repealed by the Chickasaw Legislature.    In October, 1876 or 1877, another act was passed by that Legislature, part of which reads:

"Sec. 3.    Be it further enacted, that the provisions contained in article 3 of the said treaty, giving the Chickasaw Legislature the choice of receiving and appropriating the three hundred thousand dollars therein named for the use and benefit, or passing such laws, rules and regulations as will give all persons of African descent certain rights and privileges, be, and it is hereby, declared to be the unanimous consent of the Chickasaw Legislature that the United States shall keep and hold said sum of three hundred thousand dollars for the benefit of the said negroes, and the Governor of the Chickasaw Nation is hereby requested to notify the government of the United States that it is the wish of the Legislature of the Chickasaw Nation that the government of the United States remove the said negroes beyond the limits of the Chickasaw Nation, according to the requirements of the third article of the treaty of April 28, 1866."

And again, on October 22, 1885, said Legislature passed another act, which in part reads:

"Sec. 1.    Be it enacted by the Legislature of the Chickasaw Nation, that the Chickasaw people hereby refuse to accept or adopt the freedmen as citizens of the Chickasaw Nation upon any terms or conditions whatever, and respectfully request that the Governor of our Nation notify the department of Washington of the action of the Legislature in the premises.

"Sec. 2.    Be it further enacted, that the Governor is hereby authorized and directed to appoint two competent and discreet men of good judgment and business qualifications to visit Washington City, D. C., during the next session of Congress and memorialize that body to provide a means of removal of the freedmen from the Chickasaw Nation to the country known as Oklahoma, in the Indian Territory, or to make some suitable

disposition of the freedmen question, so that they be not forced upon us as equal citizens of the Chickasaw Nation."

Viewing it, indeed, as a question and one to be settled in a general scheme of allotment by which the legal title to the tribal lands, held in fee by the tribe for the common use of its members, were intended to be divested out of the tribe and vested in its indivdual members, Congress passed an act for the appointment of the Dawes Commission (Act March 3, 1893, 27 Stat. 645, c. 209) and empowered it to enter into negotiations with this and other tribes to that end, and for the settlement of this and other incidental questions. On April 23, 1897, those negotiations were so far successful as to result in an agreement between the Commission and the representatives of the Choctaw and Chickasaw Nations, known as the "Atoka Agreement," which was ratified and confirmed by and embodied in the Curtis Act of June 28, 1898 (30 Stat. 505, c. 517). Pertinent to the question here involved, said act provided:

"Sec. 21.  *  *  *  It [the Dawes Commission] shall make a correct roll of Chickasaw freedmen entitled to any rights or benefits under the treaty made in 1866 between the United States and the Chickasaw and Choctaw Tribes, and their descendants born to them since the date of said treaty, and forty acres of land, including their present residences and improvements, shall be allotted to each, to be selected, held, and used by them until their rights under said treaty shall be determined in such manner as shall be hereafter provided by Congress."

"29.  *  *  *  That all the lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes, so as to give to each member of these tribes, so far as possible, a fair and equal share thereof, considering the character and fertility of the soil and location and value of the lands.  *  *  *  The lands allotted to the Choctaw and Chickasaw freedmen are to be deducted from the portion to be allotted under this agreement to the members of the Choctaw and Chickasaw Tribe so as to reduce the allotment to the Choctaws and Chickasaws by the value of the same. That the said Choctaw and Chickasaw freedmen who may be entitled

to allotments of forty acres each shall be entitled each to land equal in value to forty acres of the average land of the two Nations.   *   *   *   All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from the date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of patent.  This provision shall also apply to the Choctaw and Chickasaw freedmen to the extent of his allotment.   *   *   *   That as soon as practicable, after the completion of said allotments, the Principal Chief of the Choctaw Nation and the Governor of the Chickasaw Nation shall jointly execute, under their hands and the seals of their respective nations, and deliver to each of the said allottees patents conveying to him all the right, title, and interest of the Choctaws and Chickasaws in and to the lands which shall have been allotted to him in conformity with the requirements of this agreement.   *   *   *   Said patent shall be framed in accordance with the   *   *   *   agreement, and shall embrace the land allotted to such patentee and no other land, and the acceptance of his patents by such allottee shall be operative as an assent on his part to the allotment and conveyance of all the lands of the Choctaws and Chickasaws in accordance with the provisions of this agreement, and as a relinquishment of all his right, title, and interest in and to any and all parts thereof."

It will be observed, relative to the holding of this 40 acres by said freedmen that these provisions are qualified by section 21, *supra,* which says this 40 acres is "to be selected, held and used by them until their rights under the treaty shall be determined in such manner as shall be hereafter provided by Congress," which means that it was agreed by and between the Chickasaws and the United States that these freedmen were to be allotted upon these tribal lands precisely in the same manner as the Chickasaws, but temporarily, and when so allotted, were to have a right equal to the right of the Chickasaws to hold and use these lands until the freedmen's rights thereto under the treaty of 1866 were determined in the manner to be thereafter provided by law.  Accordingly the United States and the Choctaw and Chickasaw Nations, on March 21, 1902, and after the opening

of the land office for filing in those Nations (April 4, 1903), made another and a supplemental agreement, which was approved by act of July 1, 1902, and ratified by those Nations and became effective September 25, 1902. Section 36 of that act provides:

"Authority is hereby conferred upon the Court of Claims to determine the existing controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw and Chickasaw Nations under the third article of the treaty of eighteen hundred and sixty-six, between the United States and the Choctaw and Chickasaw Nations, and under any and all laws subsequently enacted by the Chickasaw Legislature or by Congress."

By section 37 the Attorney General of the United States directed to file in the Court of Claims, within a certain time, a bill against the Choctaws and Chickasaws and the Chickasaw freedmen "setting forth the existing controversy between the Chickasaw Nation and the Chickasaw freedmen and praying that the defendants thereto be required to interplead and settle their respective rights in such suit." The act then provides in section 40:

"In the meantime the Commission to the Five Civilized Tribes shall make a roll of the Chickasaw freedmen and their descendants, as provided in the Atoka Agreement, and shall make allotments to them as provided in this agreement, which said allotments shall be held by the said Chickasaw freedmen, not as temporary allotments, but as final allotments, and in the event that it shall be finally determined in said suit that the Chickasaw freedmen are not, independently of this agreement, entitled to allotments in the Choctaw and Chickasaw lands, the Court of Claims shall render a decree in favor of the Choctaw and Chickasaw Nations according to their respective interests, and against the United States, for the value of the lands so allotted to the Chickasaw freedmen as ascertained by the appraisal thereof made by the Commission to the Five Civilized Tribes for the purpose of allotment, which decree shall take the place of said lands and shall be in full satisfaction of all claims by the Choctaw and Chickasaw Nations against the United States

or the said freedmen on account of the taking of the said lands for allotment to said freedmen. *   *   *"

It is sufficient to say of said suit that the same was brought, and resulted in a judgment, in effect, that the freedmen took no rights under the treaty; that they were citizens of the United States, and as such had no right to the 40 acres in controversy, except by virtue of their allotment thereon and payment therefor by the United States which the court ordered the United States to do. Now, with this patent in their hands, providing, in effect, as it does, pursuant to the statute, *supra*, that the land thereby conveyed to these freedmen, as stated, "shall be nontaxable while the title remains in the original allottee," the question is whether said clause does not vest in them a vested right of exemption from taxation, which cannot be abrogated by the act of Congress of May 27, 1908, removing restrictions therefrom and providing that thereafter the same should be subject to taxation. We think it does, and that such vested right is within the protection of the fifth amendment of the Constitution of the United StSates. Precisely the same inquiry arose in *Choate et al. v. Trapp, Sec'y. et al.*, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, with reference to the allotments of the Choctaws and Chickasaws under the Atoka Agreement. There in the syllabus the court held that:

"Choctaw and Chickasaw allottees under the Atoka Agreement embodied in the act of June 28, 1898, under which, in part consideration of their relinquishment of all claim to the tribal property, they were to receive allotments of the lands in severalty, which were to be nontaxable for a specified period while the title remained in the original allottees, acquired vested rights of exemption from state taxation, protected by Const. U. S. Amend. 5, from abrogation during that period, as was attempted by the act of May 27, 1908 (35 Stat. 312, c. 199), removing the restrictions upon alienation, and providing that lands from which such restrictions had been removed should be subject to taxation."

While allotment was made to these freedmen, not only under that agreement, but also under the agreement approved by the

act of July 1, 1902, supplementary thereto, we are of opinion that this case is ruled by the opinion in that case, since everything that was said in support of the tax exemption there is equally applicable to the tax exemption claimed here. There the court said:

"The individual Indian had no title or enforceable right in the tribal property." Neither did the freedmen. "But as one of those entitled to occupy the land, he did have an equitable interest which Congress recognized, and which it desired to have satisfied and extinguished."

Equally anxious was Congress to give the freedmen a chance to establish his equitable interest, if any he had thereto, which he claimed therein, and, when established, to have it satisfied and extinguished. Clear it is that the common grounds upon which these contending forces stood was that each had a claim—one well and the other ill founded as it fell out, but both a claim. Continuing the court said:

"The Curtis Act was framed with a view of having every such claim satisfactorily settled. And though it provided for a division of the lands in severalty, it offered a patent of nontaxable land only to those who would relinquish their claim in the other property of the Tribe formerly held for their common use. For the Atoka Agreement, after declaring that 'all land allotted should be nontaxable,' stipulated further that each enrolled member of the Tribes should receive a patent framed in conformity with the agreement, and that each Choctaw and Chickasaw who accepted such patent should be held thereby to assent to the terms of this agreement and to relinquish all of his right in the property formerly held in common."

The same provision was made for the relinquishment of the claims of the freedmen to the other lands of the Tribe, which he did when he accepted his patent, as we have seen.

"There was here, then an offer of nontaxable land. Acceptance by the party to whom the offer was made with the consequent relinquishment of all claim to other lands furnished a part

of the consideration if indeed, any was needed, in such a case, to support either the grant or the exemption. * * * Upon delivery of the patent the agreement was executed, and the Indian was thereby vested with all the right conveyed by the patent, and, like a grantee in a deed poll, or a person accepting the benefit of a conveyance, bound by its terms, although it was not actually signed by him. * * * As the plaintiffs were offered the allotments on the conditions proposed, as they accepted the terms, and, in the relinquishment of their claim, furnished a consideration which was sufficient to entitle them to enforce whatever rights were conferred, we are brought to a consideration of the question as to what those rights were."

The court then proceeded to hold, as indicated in that part of the syllabus, *supra*, and declared:

"* * * The provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant. That right, fully vested in the Indians, was binding in Oklahoma."

It will not do to say, as urged in that case, that this tax exemption was without consideration and was a mere bounty, valuable so long as Congress chose to concede it, and which it had a right to withdraw at any time, and which it did withdraw by the act, supra, purporting to subject these lands to taxation; this for the reason that, if either grant or exemption required a consideration to support it, such is conclusively presumed, for the reason that the patent conveying both is a sealed instrument. But no consideration is required to support either, for the reason that no consideration is necessary to pass the title to land, and this exemption, being appurtenant thereto, is as much a part of the land as the land itself, and passed with the title to the land. It follows that these freedmen, on delivery and acceptance of the patent, took a vested right in both, and that Congress can divest or abrogate neither by subsequent legislation. But, if such was necessary, we would not have to look far to find a consideration to support both grant and exemption.

In *Bradley v. McAtee, etc., et al.,* 70 Ky. (7 Bush) 677, 3 Am. Rep. 309, the general rule is laid down, which meets our approval, that the state will never be irrevocably bound by a tax exemption, unless, among other things, by the exemption the tax-payer is induced to embark in some enterprise, or to invest his means in some adventure, which, if successful, will result advantageously to the state as well as to himself. Assuming this rule to be applicable here, we think the tax exemption should be equally irrevocable where, as here, these potential taxpayers were induced by the Atoka Agreement offering it, and the act of July 1, 1902, to embark upon a litigation, each with a view of obtaining, ultimately, a nontaxable grant of land. Looking at the case in the large, here are these freedmen, just emancipated, occupying lands patented to the Chickasaws. Then came the United States, and by the third article of the treaty of 1866 sought to provide each of them 40 acres of this land, upon which taxation was unknown, and thereby left the impression in their minds that such had been done, to the extent, at least, that the freedmen have ever since asserted a claim thereto under said treaty. Then along came allotment in severalty of these lands, at which time the United States, believing their claim to have foundation sufficient to be adjudicated, offered them in the Curtis Act a nontaxable patent therefor if they would enroll and prepare for allotment, and by the act of July 1, 1902, offered them a forum for the adjudication of their claims, and directed the Attorney General of the United States to bring suit therein against the Choctaws and Chickasaws and these freedmen, setting forth the controversy between these contending parties, and requiring them to interplead and settle their respective rights in that suit. This same act led these freedmen, still with a patent to said 40 acres of nontaxable land as an ultimate inducement, to enroll and file upon their lands and take them as their permanent allotment, with the understanding with the United States that they litigate their adversaries, and, failing in the litigation to establish their claim to the land, the United States

would pay their adversary, the Chickasaws, therefor.  They did so, and, the litigation resulting disastrously to them, a judgment went against the United States in favor of the Chickasaws for the value of the freedmen's holdings.  Thereupon patent issued to and was accepted by the freedmen, as stated, containing in effect the tax exemption under construction.  It goes without saying that these freedmen were induced to embark upon this enterprise of securing these patents and investing their means therein; that the arrangement contained every element of a contract with the United States.  The result was both advantageous to themselves and the United States, and that the detriment to these freedmen in earning each has patent is a sufficient consideration therefor.  *Thompson v. Holton,* 6 McLean, 386, Fed. Cas. No. 13,958; *Coney v. Owen,* 6 Watts (Pa.) 435; 12 Am. & Eng. Enc. 385.  *State v. County Court,* 19 Ark. 360; *Brooks v. Jasper County,* 20 Ind. 416.

But it is urged these freedmen took their rights to the land solely under the Supplemental Agreement of July 1, 1902, and as that act provides, in section 13, "The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment," and contains no exemption from taxation, none was intended.  Not so, for the reason that said act is supplemental to the Atoka Agreement.  Both acts provide the machinery for these allotments and the safeguards with which they are to be surrounded when made.  As the former provides (section 29) that "all lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed 21 years from date of patent,  *  *  *  and which shall be inalienable for 21 years from the date of patent," this tax exemption, not being inconsistent with the latter act, must stand, because of that provision of the latter act, which reads:

"Section 68.  No act of Congress or treaty provision, nor any provision of the Atoka Agreement, inconsistent with this

agreement, shall be in force in said Choctaw and Chickasaw Nations."

I respectfully submit that it follows that these lands are not taxable, and that the judgment of the trial court should be reversed. I am authorized to state that KANE, C. J., joins me in this dissent.