# UNITED STATES *v.* THE CHOCTAW NATION AND THE CHICKASAW NATION.

# THE CHICKASAW FREEDMEN *v.* THE CHOCTAW NATION AND THE CHICKASAW NATION.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 322, 323.   Argued January 26, 27, 1904.—Decided February 23, 1904.

The provisions of the treaty of July 10, 1866, between the United States and the Chickasaw and Choctaw Indians in regard to the Chickasaw freedmen were not complied with, either by the Indians who did not confer any rights on the freedmen, or by the United States which did not remove any of the freedmen from the territory of the Indians.

The freedmen were never adopted into the Chickasaw nation, or acquired any rights dependent on such adoption, and are not entitled to allotments in Choctaw and Chickasaw lands as members thereof; and not having removed from the territory are not entitled to any beneficial interest in the $300,000 fund referred to in the treaty, which in case they were not adopted into the Chickasaw nation was to be held in trust for such of the freedmen, and only such, as removed from the territory.

Under the subsequent agreement of 1902, and not independently thereof, the freedmen became entitled to land equal to forty acres of the average land of the Choctaws and Chickasaws, the Indians to be compensated therefor by the United States, Congress having by the agreement of 1902 provided for them in this manner in case it should be, as it is, determined in this case that they are not entitled otherwise to allotments in the Choctaw and Chickasaw lands.

THESE are cross appeals from a decree of the Court of Claims, entered in a suit brought under an agreement between the United States and the Choctaw and the Chickasaw Indians, made March 21, 1902, and ratified and affirmed by the act of July 1, 1902.   32 Stat. 641, 649.

The controversy is as to the relations of the Chickasaw freedmen to the Chickasaw Nation, and the rights of such freedmen, independent of such agreement, in the lands of the said Indian nations under the third article of the treaty of 1866, between the United States and the said nations, and un-

der any and all laws subsequently enacted by the Chickasaw legislature or by Congress.

There is no dispute about the facts. They are substantially as follows: By treaty of October 20, 1832, the Chickasaw Indians ceded to the United States, for the purpose of sale, their land east of the Mississippi River, and later were permitted to migrate west of that river. By the treaty between the Choctaw and Chickasaw tribes of June 17, 1837, the Chickasaw tribe was permitted to occupy, with the Choctaw tribe, certain territory within the United States, the United States confirming the treaty; and such occupation by a treaty with the tribes June 22, 1855. By this treaty the lands were guaranteed "to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common; so that each and every member of either tribe shall have an equal undivided interest in the whole." By said treaty the said tribes leased to the United States "all that portion of their common territory west of the ninety-eighth degree of west longitude" for the settlement of the Wichita and other tribes of Indians. The leased territory was also to be opened to the settlement by Choctaws and Chickasaws. This is the "leased district" hereinafter referred to. The Choctaws and Chickasaws are separate nations. Upon the breaking out of the civil war they entered into relations with the Southern confederacy, and took up arms against the United States. On January 1, 1863, the President of the United States, in pursuance of the proclamation of September 22, 1862, issued a proclamation abolishing slavery.

The appellants in No. 323 are the survivors or descendants of the slaves held by the Chickasaw Nation and number about 9,066. The Creeks, Cherokees and Seminoles also rebelled against the United States, and on the tenth of September, 1865, a treaty was entered into at Fort Smith, Arkansas, between them, said Choctaws and Chickasaws and the United States, by which they and the said Choctaws and Chickasaws renewed their allegiance to the United States, and acknowledged themselves to be under the protection of the United States, and covenanted and agreed that thereafter they would in all things recognize the

government of the United States, which should exercise exclusive jurisdiction over them. The United States on its part promised to afford ample protection for the security of the persons and property of the respective nations or tribes. The treaty was ratified by the legislature of the Chickasaw Nation.

A treaty was concluded between the United States and the Choctaw and Chickasaw Indians, and proclaimed July 10, 1866. It provided, among other things, as follows:

" ARTICLE II. The Choctaws and Chickasaws hereby covenant and agree that henceforth neither slavery nor involuntary servitude, otherwise than in punishment of crime, whereof the parties shall have been duly convicted, in accordance with laws applicable to all members of the particular nation, shall ever exist in said nations.

" ARTICLE III. The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of 98° west longitude, known as the leased district, provided that the said sum shall be invested and held by the United States, at an interest not less than five per cent, in trust for the said nations, until the legislatures of the Choctaw and Chickasaw Nations, respectively, shall have made such laws, rules and regulations as may be necessary to give all the persons of African descent, resident in the said nations at the date of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys and public domain claimed by or belonging to said nations, respectively; and also to give such persons who were residents, as aforesaid, and their descendants, forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said land, after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided; and immediately upon the enactment of such laws, rules and regulations the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw Nations in the pro-

portion of three-fourths to the former and one-fourth to the latter, less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to as within ninety days after the passage of such laws, rules and regulations shall elect to remove and actually remove from said nations, respectively. And should said laws, rules and regulations not be made by the legislatures of said nations, respectively, within two years from the ratification of this treaty, then the said sum of three hundred thousand dollars shall cease to be held in trust for the said Choctaw and Chickasaw Nations, and be held for the use and benefit of such said persons of African descent as the United States shall remove from the said Territory in such manner as the United States shall deem proper, the United States agreeing, within ninety days from the expiration of the said two years, to remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed from said nations to have no benefit of said sum of three hundred thousand dollars, or any part thereof, but shall be upon the same footing as other citizens of the United States in the said nations."

The legislature of the Chickasaw Nation has taken action at various times in regard to the said Chickasaw freedman, as follows:

On November 9, 1866, the Chickasaw legislature passed an act declaring it to be the unanimous desire of the legislature that the United States hold the share of the Chickasaw Nation in the $300,000, stipulated for the cession of the "leased district," for the benefit of the Chickasaw freedmen and remove them beyond the limits of the Chickasaw Nation, according to the third article of the treaty of 1866.

In 1868 similar action was taken by the Chickasaw legislature, asking for the removal, by the United States, of the Chickasaw freedmen from the Chickasaw country.

January 10, 1873, the Chickasaw legislature passed an act by which the freedmen were declared to be adopted in conformity with the third article of the treaty of 1866. Certain conditions were expressed, and it was provided that the act

should " be in full force and effect from and after its approval by the proper authority of the United States."

That act was transmitted by the governor of the Chickasaw Nation, by letter of the same date, to the President of the United States, and was submitted by the Secretary of the Interior to the Speaker of the House of Representatives on February 10, 1873, with recommendation for appropriate legislation for extending the time for the execution of the third article of the treaty. The papers were referred to the Committee on Freedmen Affairs, but no action thereon was had at that time.

In October, 1876 or 1877, another act was passed, section 3 of which was as follows:

" SEC. 3. Be it further enacted, that the provisions contained in article 3 of the said treaty, giving the Chickasaw legislature the choice of receiving and appropriating the three hundred thousand dollars therein named for the use and benefit, or passing such laws, rules and regulations as will give all persons of African descent certain rights and privileges, be, and it is hereby, declared to be the unanimous consent of the Chickasaw legislature that the United States shall keep and hold said sum of three hundred thousand dollars for the benefit of the said negroes, and the governor of the Chickasaw Nation is hereby requested to notify the government of the United States that it is the wish of the legislature of the Chickasaw Nation that the government of the United States remove the said negroes beyond the limits of the Chickasaw Nation, according to the requirements of the third article of the treaty of April 28, 1866."

An act passed October 22, 1885, provided, *inter alia*, as follows :

" SEC. 1. Be it enacted by the legislature of the Chickasaw Nation, That the Chickasaw people hereby refuse to accept or adopt the freedmen as citizens of the Cherokee Nation upon any terms or conditions whatever, and respectfully request the governor of our nation to notify the department at Washington of the action of the legislature in the premises.

" SEC. 2. Be it further enacted, That the governor is hereby

authorized and directed to appoint two competent and discreet men of good judgment- and business qualifications to visit Washington city, D. C., during the next session of Congress and memorialize that body to provide a means of removal of the freedmen from the Chickasaw Nation to the country known as Ok la ho ma, in the Indian Territory, or to make some suitable disposition of the freedmen question, so that they be not forced upon us as equal citizens of the Chickasaw Nation."

Congress took no action until August 15, 1894, when it passed an act, section 18 of which provided—

. " That the approval of Congress is hereby given to. ' An act to adopt the negroes of the Chickasaw Nation,' and so forth, passed by the legislature of the Chickasaw Nation and ap-' proved by the governor thereof January tenth, eighteen hundred and seventy-three, particularly as set forth in a letter from the Secretary of the Interior transmitting to Congress a copy of the aforesaid Act contained in House Executive Document numbered two hundred and seven, Forty-second Congress, third session." 28 Stat. 286, 336.

Subsequently, April 23, 1897, an agreement was entered into between the United States and the Choctaw and Chickasaw tribes, which was ratified and confirmed by an act passed June 28, 1898, section 29 of which (30 Stat. 495, 505), provided as follows :.

" That all the lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes, so as to give to each member of these tribes, so far as possible, a fair and equal share thereof, considering the character and fertility of the soil and the location and value of the lands. . . .

" The lands allotted to the Choctaw and Chickasaw freedmen are to be deducted from the portion to be allotted under this agreement to the members of the Choctaw and Chickasaw tribe so as to reduce the allotment to the Choctaws and Chickasaws by the value of the same.

" That the said Choctaw and Chickasaw freedmen who may be entitled to allotments of forty acres each shall be entitled

each to land equal in value to forty acres of the average land of the two nations."

These provisions relative to the freedmen are previously qualified as to their holdings of such lands by this clause in the statute, " to be selected, held and used by them until their rights under said treaty shall be determined, in such manner as shall hereafter be provided by act of Congress."

Then came the agreement of 1902. It provides for the allotment of land to each member of the Choctaw and Chickasaw tribes of three hundred and twenty acres and to each freedman " land equal in value to forty acres of the average allottable land of the Choctaw and Chickasaw Nations."

The agreement provides also as follows :

" 36. Authority is hereby conferred upon the Court of Claims to determine the existing controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw and Chickasaw Nations under the third article of the treaty of eighteen hundred and sixty-six, between the United States and the Choctaw and Chickasaw Nations, and under any and all laws subsequently enacted by the Chickasaw legislature or by Congress.

" 37. To that end the Attorney General of the United States is hereby directed, on behalf of the United States, to file in said Court of Claims, within sixty days after this agreement becomes effective, a bill of interpleader against the Choctaw and Chickasaw Nations and the Chickasaw freedmen, setting forth the existing controversy between the Chickasaw Nation and the Chickasaw freedmen and praying that the defendants thereto be required to interplead and settle their respective rights in such suit."

" 40. In the meantime the commission to the Five Civilized Tribes shall make a roll of the Chickasaw freedmen and their descendants, as provided in the Atoka agreement, and shall make allotments to them as provided in this agreement, which said allotments shall be held by the said Chickasaw freedmen, not as temporary allotments, but as final allotments, and in the event that it shall be finally determined in said suit that

the Chickasaw freedmen are not, independently of this agreement, entitled to allotments in the Choctaw and Chickasaw lands, the Court of Claims shall render a decree in favor of the Choctaw and Chickasaw Nations according to their respective interests, and against the United States, for the value of the lands so allotted to the Chickasaw freedmen, as ascertained by the appraisal thereof made by the commission to the Five Civilized Tribes for the purpose of allotment, which decree shall take the place of the said lands and shall be in full satisfaction of all claims by the Choctaw and Chickasaw Nations against the United States or the said freedmen on account of the taking of the said lands for allotment to said freedmen: Provided, That nothing contained in this paragraph shall be construed to affect or change the existing status or rights of the two tribes as between themselves respecting the lands taken for allotment to freedmen, or the money, if any, recovered as compensation therefor, as aforesaid."

The agreement was ratified by the Choctaws and Chickasaws by elections September 25, 1902, and became effective on that date. The Court of Claims found the averments in the bill to be true, and found that the third article of the treaty of 1866 remained unaffected by any and all laws subsequently thereto enacted by the said Indian nations or by Congress independently of the agreement of March 2, 1902, and confirmed by act of Congress of July 1, 1902; that the Chickasaw Nation had not conferred the rights upon their freedmen as provided in said treaty or given to them forty acres of land as provided. And further found that none of the said freedmen elected to remove or were willing to remove from said nation, but they did and now do remain therein; that the United States only agreed to remove them if they were willing to be removed. And further, the freedmen, by not electing to remove from the nation and remaining therein, forfeited all benefit to the money mentioned in the treaty, "became in said nation upon the same footing as other citizens of the United States in said nation, and were entitled only to the rights and privileges of such citizens, and were not entitled to the forty acres of land mentioned and described" in said treaty. It was therefore

adjudged that, independently of said agreement, the relations of the freedmen to said nation were only those "of citizens of the United States residing in the said nation," and that the said freedmen, independently of said agreement and the aforesaid act of 1902, "have no rights in the lands of the Chickasaw Nation, nor are they, or any of them, under said article entitled to allotments in the lands of the said Chickasaw Nation. The decree concluded as follows: ·

"And it is further ordered that upon the coming in of the roll and appraisal to be made by the Dawes Commission, as referred to in the said statute, the defendants, the Choctaw and Chickasaw Nations, have leave to apply for an additional decree to be entered at the foot of this decree determining the amount which shall be paid and allowed by the United States to the said Choctaw and Chickasaw Nations, as directed by said statutes; and that the complainant, the United States, be at the same time heard in regard to such amount for which judgment shall be rendered against the United States."

*Mr. Charles W. Needham* for the Chickasaw Freedmen.

· *Mr. George A. Mansfield* and *Mr. A. A Hoehling, Jr.,* for the Choctaw and Chickasaw Nations. ·

*Mr. Assistant Attorney General Pradt* for the United States.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

Full quotations have necessarily been made from the statutes and agreements relied on and from the treaty of 1866, but the questions presented are, nevertheless, not complex.

The main, if not crucial, question is, were the freedmen adopted by the Chickasaw Nation as provided in the treaty? They were declared adopted by the act of 1873 upon certain conditions, but the act was only to have force and effect "from and after the approval by the proper authority of the United States." The United States did not approve until 1894. In the meantime, as early as 1876, the Chickasaws passed an act,

by which it was "declared to be the unanimous consent of the Chickasaw legislature" that the United States exercise the right given to it for the benefit of the freedmen by the treaty of 1866. Against the effect of this act several contentions are presented.

It is urged that the negroes became free by the emancipation proclamation and the Thirteenth Amendment to the Constitution of the United States, and acquired thereby all the rights of freemen. That may be granted, but what is its consequence? Certainly not to invest the freedmen with any rights in the property or to participate in the affairs of their former owners. For such rights we must look to the treaty and subsequent legislation and, to a certain extent, to the act which gave jurisdiction of this suit to the Court of Claims. We get no aid from the emancipation proclamation or the Thirteenth Amendment. Prominent, of course, in the inquiry is the act of adoption passed by the Chickasaw legislature in 1873. It responded, in the main, to the treaty of 1866, and if it had force in 1894, when it was approved by Congress, the adoption of the freedmen was made complete. Appellants so contend. They say the act of adoption "was complete in itself and a full exercise of the power possessed by that (Chickasaw) legislature." And, further, if the act were subject to repeal, it was not repealed. The act, it is contended, expressed a wish only and not a purpose, and left to the United States to "follow either of two courses." Counsel say: "It (the United States) could approve the act of adoption of 1873, but it could refuse to approve that act and remove the freedmen as requested by the act of 1876. The power of determining which course should be adopted rested wholly and exclusively with the United States." The argument is plausible, but we cannot assent to it. Besides, the act of 1876 does not stand alone. In 1885—nine years before Congress acted—another act was passed. Its terms were unmistakable. Its declaration was "that the Chickasaw people hereby refuse to accept or adopt the freedmen as citizens of the Cherokee Nation upon any terms or conditions whatever." The governor was requested to notify the department at Washington

of the action of the legislature, and was also directed to appoint two competent men to visit· Washington and to memorialize Congress " to provide the means of the removal of the freedmen from the Chickasaw Nation to the country known as Oklahoma in the Indian Territory." These two acts must be construed to work a repeal of the act of adoption if it could be repealed by the Chickasaw Nation. The latter is denied, and we are brought to the last contention of appellants in regard to the question of adoption. The contention is that " Congress, by the act approved August 15, 1894, gave life and vitality to the Chickasaw act of January 10, 1873," that is, as we understand the contention, by mere power and disregarding whatever of convention there was in the treaty of 1866, and whatever of volition was given to the Indians, the United States peremptorily determined the rights of the freedmen in the lands and affairs of the Indians. Granting, without deciding, that Congress possessed such power, we are forced to believe its exercise, if intended,· would have been explicit and direct, not left to be inferred by the approval of the act of 1873. That approval is, of course, an element in the controversy, but to give it the effect which appellants do is to make it practically the sole element, and reduces the case to the inquiry what Congress had willed, not what Congress had agreed to. The act of 1902 certainly contemplated and provided for a different inquiry, one that depended upon the agreements of the United States, not upon its power. And this view is supported by the opinion of the Secretary of the Interior expressed August 9, 1898, and which was presumably known to Congress when it passed the act of 1902. The opinion reviewed the treaty of 1866 and subsequent legislation, and interpreted section 18 of the act of 1894, which approved the act of adoption of 1873, as follows :

" The language of this provision is not such as would be appropriate to the enactment of original legislation, such as an adoption of the freedmen into the Chickasaw tribe by Congressional enactment, against the consent of the tribe. The terms employed harmonize better with a purpose to merely assent to, or sanction, an act of the tribal legislature supposed

to be awaiting assent, or sanction, by Congress. The words used are those of approval and acquiescence, and not those of creation or command."

The conclusion was deduced " that the Chickasaw freedmen are not members of that tribe, within the meaning of the provision of the agreement submitting the amended agreement to a vote of the male members of the tribe qualified to vote under tribal laws."

It follows from these views that the freedmen were not adopted into the Chickasaw tribe and necessarily did not acquire the rights dependent upon adoption. They make, however, a specific claim to be beneficiaries of the $300,000.

By the treaty, as we have seen, the United States was to hold that sum in trust for the Indians, to be paid to them upon their conferring certain rights upon the freedmen, and by giving the latter forty acres of land. If such rights were not conferred within two years from the ratification of the treaty the said sum should then be held in trust for said freedmen, and be held and used by the United States for the benefit of such freedmen as should remove from the territory, and the United States agreed to remove within ninety days from the expiration of said two years all such freedmen who should be willing to remove; those who remained or who should return after having been removed to have no benefit of said sum or any part thereof but should be upon the same footing as other citizens of the United States.

The treaty is clear. The Indian nations were to receive the $300,000 if they conferred upon the freedmen the rights expressed in the treaty. Failing to confer those rights, that sum was to be held in trust for all such freedmen, and only such freedmen, as should remove from the territory. The treaty was not complied with either by the Indians or the United States. No rights were conferred upon the freedmen; no freedmen were removed, and the statutes were enacted and the agreements were made that we have described. But those statutes and agreements gave no rights to the freedmen. The only explicit provision for the freedmen was the allotment of forty acres of land to each of them. They claim to be

beneficiaries of the $300,000, but the disposition of thàt under the treaty was to be in the United States, and only to be used for freedmen who should remove from the territory. None have removed. There is an intimation in the brief of their counsel that in their memorials to Congress they expressed a willingness to remove, but Congress did not choose and has not chosen to remove them; indeed, has provided for the exact opposite—provided for the allotment of homes to them out of the lands of the Indians and for payment to the Indians therefor if it should be determined, in this suit, that the freedmen were not, independently of that agreement, "entitled to allotments in Choctaw and Chickasaw lands."

As we hold the freedmen were not so entitled, the decree of the Court of Claims is

*Affirmed.*