# CHOCTAW NATION OF INDIANS *v.* UNITED STATES ET AL.

No. 80.   Argued December 7, 8, 1942.—Decided March 8, 1943.

*Mr. William G. Stigler* for petitioner.

*Mr. Robert E. Mulroney,* with whom *Solicitor General Fahy, Assistant Attorney General Littell,* and *Messrs. Vernon L. Wilkinson* and *Roger P. Marquis* were on the brief, for the United States; and *Mr. Melven Cornish* for the Chickasaw Nation,—respondents.

MR. JUSTICE MURPHY delivered the opinion of the Court.

On August 5, 1929, this suit was begun against the United States by the Chickasaw Nation under the jurisditional Act of June 7, 1924, 43 Stat. 537.[1]   By order of

---

[1] As amended by 44 Stat. 568, and 45 Stat. 1229.

January 2, 1940, the Choctaw Nation was impleaded as a defendant on motion of the United States. The question is whether the Chickasaw Nation is entitled to compensation for its one-fourth interest in the common lands of the two nations allotted to the Choctaw freedmen, and, if so, who should compensate the Chickasaw Nation. The Court of Claims held that the Chickasaws were entitled to compensation and that the primary liability, the amount of which was reserved for future determination, rested upon the Choctaw Nation. Since there was no indication that it would be unable to satisfy whatever judgment might be made, the Court of Claims declined to consider or decide the liability, if any, of the United States.[2] We granted certiorari because the case was thought to raise important questions concerning the relations between the two tribes and the United States.

At the time of the Civil War, the Chickasaws and the Choctaws were slave-owning tribes holding their lands in common, their respective interests being one-fourth and three-fourths. Both fought on the side of the Confederacy, and, after the cessation of hostilities, they entered into the Treaty of April 28, 1866, 14 Stat. 769, with the United States. That treaty abolished slavery among them and provided in Article III for a fund of $300,000 which was to be held in trust for the two nations and paid to them (one-fourth to the Chickasaws and three-fourths to the Choctaws) when they conferred tribal rights and privileges upon their former African slaves and gave them each forty acres of the common lands. If such laws were not adopted within two years, the fund was to be held for the benefit of those former slaves whom the United States should remove from the territory, instead of for the two

---

[2] 95 Ct. Cls. 192. The United States, while insisting that the Court of Claims correctly decided that the primary liability rests upon the Choctaw Nation, has joined that nation in urging before this Court that no liability in fact exists.

nations. However, the Treaty also provided in Article XLVI that $200,000 of the fund was to be paid over immediately to the two nations and this was done. See Act of July 26, 1866, 14 Stat. 255, 259.

In 1882, neither nation having acted in accordance with the Treaty and the United States having taken no steps to remove the freedmen, an act was passed by Congress which provided that either tribe might adopt and provide for their freedmen in accordance with Article III of the Treaty. Act of May 17, 1882, 22 Stat. 68, 72–73. In 1883 the Choctaws adopted their freedmen and declared them each entitled to forty acres of the nation's lands, but no allotments were actually made.[3] Congress thereupon appropriated for the Choctaws their share of the balance of the $300,000 fund. See Act of March 3, 1885, 23 Stat. 362, 366. The Chickasaws never adopted their freedmen although they took an abortive step in that direction in 1873. See *The Chickasaw Freedmen,* 193 U. S. 115, and H. Ex. Doc. No. 207, 42d Cong., 3d Sess. Despite this failure the Chickasaws received some of the balance of their share of the original fund.[4]

In 1897, the Commission of the Five Civilized Tribes[5] negotiated the Atoka agreement with the two Indian nations. That provided for the allotment in severalty of the common tribal lands, including forty-acre allotments to the Choctaw freedmen, and contained a provision for the reduction of allotments to Choctaw Indian

---

[3] The act of adoption is set forth in the annual report of the Commissioner of Indian Affairs for 1884. See H. Ex. Doc. No. 1, pt. 5, 48th Cong., 2d Sess., pp. 36–37.

[4] See Act of July 26, 1866, 14 Stat. 255, 259; Act of April 10, 1869, 16 Stat. 13, 39; Act of May 17, 1882, 22 Stat. 68, 72.

[5] This Commission, commonly known as the Dawes Commission, was created by the Act of March 3, 1893, 27 Stat. 612, 645, to negotiate with the Creeks, Cherokees, Choctaws, Chickasaws and Seminoles for the extinguishment of tribal titles to land and the allotment of their lands in severalty.

citizens on account of the allotments to the Choctaw freedmen, as follows:

"Provided that the lands allotted to the Choctaw freedmen, are to be deducted from the portion to be allotted under this agreement to the members of the Choctaw tribe, so as to reduce the allotments to the Choctaws by the value of the same and not affect the value of the allotments to the Chickasaws."

No provision was made in the original Atoka agreement for allotments to the Chickasaw freedmen, but in confirming the Atoka agreement as part of the Curtis Act of 1898 (30 Stat. 495) Congress stipulated in § 21 that forty-acre allotments were to be made to the Chickasaw freedmen as well, to be used until their rights under the Treaty of 1866 were determined in such manner as Congress might direct. It also provided in § 29 that all the lands of the two tribes were to be allotted to the members of the tribes so as to give each one a fair and equal share, and that the lands allotted to the Choctaw and Chickasaw freedmen were "to be deducted from the portion to be allotted under this agreement to the members of the Choctaw and Chickasaw tribe so as to reduce the allotment to the Choctaws and Chickasaws by the value of the same." (30 Stat. 505–06.) This confirmed agreement was approved by both tribes.

Before any allotments were made, however, a supplementary agreement was entered into by the United States and the two nations in 1902 (32 Stat. 641), which radically changed matters by providing for the allotment to each member of the two tribes of but three hundred and twenty acres instead of the aliquot allotment of all the land, as provided in the Atoka agreement. Permanent allotments of forty acres were to be made to each Chickasaw and Choctaw freedman, the remaining unallotted land was to be sold and the proceeds were to be used to equal-

ize allotments as far as necessary, the balance being paid into the Treasury of the United States to the credit of the two tribes and distributed per capita as their other funds.[6] That agreement also contained elaborate provisions in §§ 36–40, inclusive, under a subheading entitled "Chickasaw Freedmen," for a suit in the Court of Claims to determine whether the Chickasaw freedmen had any right to allotments under the Treaty of 1866 and subsequent Congressional and tribal legislation, the United States to pay the value of those allotments to the two nations according to their respective interests if the Chickasaw freedmen were held to be without such rights.

The 1902 agreement contained no express provision concerning the deduction of allotments to the Choctaw freedmen from allotments to the members of the Choctaw Nation or from that nation's proportionate share in the common lands. Section 40 concluded with a proviso that: "nothing contained in this paragraph shall be construed to affect or change the existing status or rights of the two tribes as between themselves respecting the lands taken for allotment to freedmen, or the money, if any, recovered as compensation therefor, as aforesaid." A further provision of the agreement, § 68, declared that: "No act of Congress or treaty provision, nor any provision of the Atoka agreement, inconsistent with this agreement, shall be in force in said Choctaw and Chickasaw nations."

Following the 1902 agreement, allotments were made from the common lands to the citizens and the freedmen of the two tribes. The Chickasaws received no compensation for their one-fourth interest in the common lands allotted to the Choctaw freedmen either by reduction of

---

[6] The balance was distributed according to the historic proportionate interests of the tribes, one-fourth to the Chickasaws and three-fourths to the Choctaws. *Choctaw Nation* v. *United States*, 83 Ct. Cls. 140, 144.

the allotments to the Choctaw citizens or of that tribe's proportionate share, or by any other settlement or adjustment. In the litigation authorized by §§ 36–40 of the 1902 agreement, the Chickasaw freedmen were held without rights to the allotments which had been given them, and accordingly judgment was rendered against the United States for the value of their allotments in the sum of $606,936.08, which was paid to the two nations in the proportion of one-fourth to the Chickasaws and three-fourths to the Choctaws. *United States* v. *Choctaw Nation,* 38 Ct. Cls. 558, affirmed *sub nom., The Chickasaw Freedmen,* 193 U. S. 115; and see Act of June 25, 1910, 36 Stat. 774, 807–08.

The Court of Claims held that the Treaty of 1866 was not determinative, that the confirmed Atoka agreement required that allotments to Choctaw freedmen be deducted from the allotments to the Choctaw citizens and that the proviso to § 40 of the supplemental agreement of 1902, while "not well chosen" for the purpose, preserved this requirement. We take a different view.

The Treaty of 1866, in Article III of which the Chickasaws unconditionally consented to allotments from the common lands to Choctaw freedmen who might be adopted in conformity with the treaty requirements, is not determinative because it was superseded, before any allotments were made, by the confirmed Atoka agreement which required the deduction of all freedmen's allotments, both Choctaw and Chickasaw, from those of the members of their respective tribes. The Atoka agreement was in turn supplemented by the 1902 agreement, which omitted the deduction requirement of the Atoka agreement and contained not a word about deducting freedmen's allotments from the respective tribal shares in the common lands. In view of § 68 of the 1902 agreement, which

repealed all inconsistent provisions of the Atoka agreement, these omissions were fatal. When the differences between the Atoka agreement and that of 1902 are considered, it is clear that the deduction provision of the former was inconsistent with the latter. The Atoka agreement provided for the allotment of all the land with the members of the tribes sharing equally, and the allotments to their freedmen were to be deducted from their portion so as to reduce their allotments *pro tanto*. But under the 1902 agreement the members of both tribes were to receive definite allotments of three hundred and twenty acres instead of equal shares of the whole. If the forty-acre allotments to freedmen were deducted from the specific allotments to members of their tribes so as to reduce those allotments "by the value of the same," as required by the Atoka agreement, the members would not have received their designated acreage. Also, an attempt to shift the deduction burden from members' allotments to the proportionate shares of the tribes in the unallotted lands which were to be sold is barred by the fact that the Atoka agreement required deduction to reduce the value of members' allotments, not to reduce the respective interests of the tribes in the proceeds from the sale of unallotted lands, a provision wholly foreign to the Atoka agreement.

Further proof of the inconsistency between the 1902 agreement and the deduction requirement of the Atoka agreement is the fact that allotments to Chickasaw freedmen were made from the common lands and both tribes were to and did share, "according to their respective interests," in the ultimate recovery of the value of those lands from the United States, as promised in § 40. Only the Chickasaws should have been compensated for the

allotments to their freedmen if the deduction require-
ment of the Atoka agreement was carried over into the
1902 agreement, whether that provision be taken as re-
quiring the reduction of members' allotments (which it
did), or as requiring the reduction of the tribes' propor-
tionate shares in the common lands (which it did not).
The circumstance that both tribes were to and did share
in the award supports the conclusion that allotments to
all freedmen were to be charged to the common holdings
without deduction from the respective tribal interests.

Despite these inconsistencies, the Chickasaws urge that
the proviso to § 40 of the 1902 agreement preserved the
deduction requirement of the Atoka agreement. The
terms of the proviso, however, do not support this conclu-
sion. It does not read, as the Chickasaws would have it,
that "nothing contained in this *agreement* shall be con-
strued to affect or change the existing status or rights of
the two tribes as between themselves respecting the lands
taken for allotment to freedmen, or the money, if any,
recovered as compensation therefor, as aforesaid." Actu-
ally the proviso concerns itself only with the possible
effect of "this paragraph" which must mean §§ 36–40,
grouped under the heading "Chickasaw Freedmen."
That "paragraph" merely required that allotments to the
Chickasaw freedmen were to be permanent, that their
right to allotments be litigated in the Court of Claims,
and that any resulting award be paid to both tribes by the
United States. Not once in the entire "paragraph" is
there a reference to Choctaw freedmen. And, since the
proviso concludes with a reference to "the money, if any,
recovered as compensation therefor, as aforesaid," it even
more clearly was not concerned with allotments to Choc-
taw freedmen because no provision was made in the 1902
agreement for money recovery in the case of allotments to
Choctaw freedmen. If the proviso is construed as pre-

serving the deduction requirement, it is rewritten in effect, and this should not be done.

In so construing the proviso, the Court of Claims relied heavily upon certain findings of fact, set forth below,[7] to show that was the intention and understanding of the parties. Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning

---

[7] The court found:

(a) That the Chickasaws objected to allotments to the Choctaw freedmen out of the commonly owned lands;

(b) That the Chickasaws insisted that the 1902 Agreement contain some provision saving their rights not to have allotments to the Choctaw freedmen made at the expense of the Chickasaws' interest in the common lands, and after a conference with the assistant attorney general who was legal adviser to the Department of the Interior, it was agreed that the proviso to § 40 be included to protect their interests;

(c) That the Choctaw Nation, prior to the entry of final judgment on January 24, 1910, in the proceeding authorized by §§ 36–40 (see 38 Ct. Cls. 558; 193 U. S. 115), filed an "Application for Additional Decree" in which it set out that the Chickasaws were entitled to compensation for their proportionate interest in the commonly owned lands allotted to the Choctaw freedmen and requested the court to enter a supplemental decree deducting from their proportionate share of the judgment one-fourth of the value of the jointly held lands allotted to the Choctaw freedmen and add that amount to the amount to be apportioned to the Chickasaw Nation under the judgment. (No action was taken on this request.)

(d) That on March 11, 1910, the Governor of the Chickasaw Nation wrote to the Commissioner of Indian Affairs requesting permission to employ separate counsel for the Chickasaw Nation and setting out in support of this request the Chickasaws' claim for compensation for lands allotted to the Choctaw freedmen out of the common domain of the two nations without the consent of the Chickasaws and pointed out that the Chickasaws had had no attorney to represent them at the time that judgment was entered in the suit brought pursuant to the Supplemental Agreement. The Commissioner recommended denial of the request on the ground that in view of the admission of the Choctaws in their request for an additional decree, judicial action did not seem to be necessary to settle the controversy.

we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. *Factor* v. *Laubenheimer,* 290 U. S. 276, 294–95; *Cook* v. *United States,* 288 U. S. 102, 112. Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." *Tulee* v. *Washington,* 315 U. S. 681, 684–85. See also *United States* v. *Shoshone Tribe,* 304 U. S. 111, 116; *Choctaw Nation* v. *United States,* 119 U. S. 1, 28. But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties. Cf. *United States* v. *Choctaw and Chickasaw Nations,* 179 U. S. 494, 531–33; *United States* v. *Mille Lac Chippewas,* 229 U. S. 498, 500. Here the words of the proviso are inapposite to the proposed construction and we do not believe the findings are enough to warrant departing from the language used. The findings are merely findings as to evidence. There is no finding as to the ultimate fact whether or not the two tribes intended to agree on something different from that appearing on the face of the 1902 agreement. Without such a finding the agreement must be interpreted according to its unambiguous language. Furthermore, if we were to find the ultimate fact, we seriously doubt whether we could discover from these evidentiary findings what the agreement among the two tribes and the United States was, if other than that expressed in the 1902 agreement. For the most part, the findings are concerned with the assertions and claims of the Chickasaws. The only indication that the Choctaws ever shared those views at any time is their request for an "Additional Decree," upon which no action was ever taken.

Equitable considerations do not dictate a different result. By the Treaty of 1866 both tribes shared in the $200,000 advance payment for the adoption of their freedmen and the allotment of forty acres of land to them. Even though the Chickasaws never adopted their freedmen, they did receive a portion of their share of the balance of the original $300,000 treaty fund.[8]   When they contested the right of their freedmen to allotments, the United States explicitly promised in the 1902 agreement to reimburse them if there were an adverse judicial decision.  The agreement contained no promise to reimburse them for allotments to Choctaw freedmen, and, in view of the specific promise with regard to their own freedmen, none should be implied.

We conclude that allotments from the common tribal lands were to be made under the 1902 agreement to Choctaw freedmen without deducting those allotments from the Choctaw Nation's share of the lands or otherwise compensating the Chickasaws for their interest in the lands so allotted.   Since no liability exists, it is unnecessary to consider whether the Choctaw Nation or the United States is primarily liable, or whether the Court of Claims had power under the jurisdictional act (43 Stat. 537) to place liability upon the Choctaw Nation.

The judgment below is reversed and the cause remanded with instructions to dismiss the petition.

*Reversed.*

MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

---

[8] See note 4, *ante.*