976 F.2d 746
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
TELESAT DE PANAMA, S.A., Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF DEFENSE; Richard B. Cheney,
Secretary of Defense; United States Army;
Michael P.W. Stone, Secretary of the
Army and Roberta K. Payne,
Defendants-Appellees.
 No. 92-1099.
 United States Court of Appeals, Federal Circuit.
 Aug. 7, 1992.
 
 Before PAULINE NEWMAN, MICHEL and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Telesat De Panama, S.A. (Telesat), a foreign corporation, appeals both the May 3, 1991 and July 12, 1991 judgments from the bench by the United States District Court for the Eastern District of Virginia. On May 3, the district court, finding no waiver of sovereign immunity, dismissed Counts II and III of Telesat's amended complaint, which alleged a tort action under the Panama Canal Treaty, for failure to state a claim upon which relief could be granted. At the same time, the district court denied the government's motion to dismiss the remaining counts, reserving the question of whether those counts could survive a motion for summary judgment. On July 12, the district court granted the government's motion for summary judgment on Telesat's Tucker Act claim (Count One), on the ground that Telesat failed to produce enough proof of bad faith to create a triable issue of fact. The district court also granted the government's summary judgment motion on Telesat's Administrative Procedure Act (APA) claim by dismissing Count Four on the affirmative defense of laches. Because the district court granted summary judgment on the laches defense when a dispute existed over a genuine issue of material fact, we reverse the grant of summary judgment on the APA claim. Because the district court erred as a matter of law in its assessment of the evidence on the Tucker Act claim, we reverse the grant of summary judgment on that count. Because the district court erred as a matter of law in dismissing the Panama Canal Treaty counts, we reverse the dismissal of Counts Two and Three. The case is remanded for further proceedings consistent with this opinion.
 
 
 2
 * This case arises from the award of a United States Army (Army or government) contract to provide cable television service to United States armed forces personnel stationed in the Republic of Panama. The solicitation for the contract issued as a Request for Proposals (RFP) on September 23, 1987. There were two components to the contract: one for the installation of the appropriate hardware, and one for providing programming. The dispute here centers around the programming component of the contract.
 
 
 3
 The requirements of the RFP relating to programming are Technical Exhibit # 7 (TE # 7) to the RFP and sections C.6.5 and C.5.1 of the RFP. TE # 7 stated that all proposals must carry at least 16 channels on each coast, listed the five required categories of channels, and indicated other options and permissible substitutions. In addition to complying with TE # 7, the offeror had to agree "that at no time shall it transmit the programming of another entity without the express permission of that entity for the use or retransmission of any programming[,]" pursuant to section C.6.5 of the RFP. Violation of the clause would result in immediate termination for default. Section C.5.1.2 et seq. further required contractors to obtain licenses and permits for broadcasting within a particular bandwidth. Under section C.5.1.2.1, contractors were required to furnish written evidence that, if awarded the contract, the Panamanian government would permit such broadcasting. Failure to submit such evidence in the contract proposal "shall be grounds for rejection of the proposal."
 
 
 4
 By the Best and Final Offer (BAFO) deadline of December 11, 1987, four companies had submitted proposals--Telesat, Visat, Satelco and Satellite Entertainment System (SES). Both Telesat's and SES' offers were rejected on January 6, 1988. According to the Contracting Officer (CO), Joseph Diaz, Telesat's offer was rejected because it did not provide proof of authorization or agreement with HBO, Cinemax, The Movie Channel or Showtime to broadcast the proposed programming. The contract was awarded to Visat on January 15, 1988.
 
 
 5
 Section C.5.1.2 of the RFP required authorization from the Panamanian government to broadcast within a particular bandwidth. By the BAFO date, Visat had not submitted any proof that it met this requirement; it had instead submitted a resolution from the Ministry of the Interior of Panama which provisionally authorized an entity known as Cable Vision International (CVI) to use the required frequencies. CVI had no apparent relationship to any of the bidders. Telesat claims, and the government does not deny, that sometime between the BAFO submission date and the date of the contract award, a meeting between CO Diaz, Augosto Garcia of Visat and Walter McGowen of Satelco took place. The latter two were principals of their respective companies. In this post-BAFO, pre-award meeting, Garcia and McGowen told Diaz that McGowen, while having an interest in Satelco, also controlled CVI, and that Visat would be able to use CVI's frequencies. No record of this meeting was made, nor were the other two bidders ever notified of what transpired.
 
 
 6
 Prior to the award, the parties to the contract apparently understood that Visat would have use of CVI's provisional license, which according to its terms could not be extended past August 20, 1988 at the latest. Moreover, that license permitted broadcasting on only eight channels per coast, whereas the contract required 16.
 
 
 7
 Visat began broadcasting under the contract in August 1990, although the Army's Chief for the Bureau of Contracting had known since July 1988 that Visat did not have the necessary broadcast licenses. In addition, the Army received a letter dated August 9, 1990 from the Secretary of Communication of Panama stating that Visat has no authority to operate on frequencies because the CVI provisional license had been revoked on March 15, 1988.
 
 
 8
 Telesat first learned about the secret post-BAFO meeting and Visat's serious BAFO and performance deficiencies as a result of a news article appearing in the Panamanian press in September 1990, which stated that Visat was broadcasting illegally. Following the press article, Telesat made inquiries on its own and through its counsel. These inquiries brought to light the pre-contract award meeting. In conducting its own investigation, Telesat requested help from Senator John Warner and Congressman Frank Wolf. The U.S. Ambassador to Panama, in response to an inquiry from Senator Warner, told him on October 22, 1990 that Visat was broadcasting under provisional assignment of broadcast frequencies from the Panamanian Government. Similarly, the Commanding General U.S. Army South stated in an October 24, 1990 letter to Congressman Wolf that the Government of Panama had made no legal or diplomatic complaint about Visat's broadcasting. Telesat contends that the United States government had been notified on August 10, 1990 by the government of Panama that Visat was operating illegally.
 
 II
 
 9
 As a result of its investigations, Telesat filed suit on February 4, 1991 alleging improper award of the contract, and seeking damages as well as equitable relief. Specifically, Telesat alleged in Count I bad faith on the government's part in awarding the contract, a violation of the Tucker Act, 28 U.S.C. § 1346 (1988); in Count II, a conspiracy to violate the Panama Canal Treaty of 1977; in Count III, a violation of the Panama Canal Treaty of 1977; and in Count IV, an arbitrary and capricious contract award, a violation of the Administrative Procedure Act, 5 U.S.C. § 706 (1988). Telesat originally sought to set aside the entire contract, and have the contract instead awarded to it. Before the district court, though, Telesat indicated that its real interest was in the portion still being performed, namely the programming component.
 
 
 10
 The crux of Telesat's complaint both before the district court and on appeal is that the government improperly required more of it than the RFP mandated, while simultaneously lowering the requirements for Visat, the eventual winner. In support of its theory, Telesat points to the programming proposal it submitted, which included Showtime, HBO, Cinemax and The Movie Channel. The technical advisor to the contract, Lt. Colonel Honey, told CO Diaz that in light of problems cable companies previously had had in legally obtaining rights to rebroadcast Showtime, Telesat should submit further information in the form of letters of authorization or agreement from the four proposed channels. Diaz did indeed require Telesat to submit this information, but Telesat did not do so in its BAFO. Particularly in light of this requirement, which was beyond the terms of the RFP, Telesat objects to the award of the contract to Visat, when Visat failed to satisfy the requirement that it produce documented proof that it met the minimum express requirements of the RFP.
 
 III
 
 11
 We review the propriety of summary judgment de novo. National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572, 1576, 19 USPQ2d 1424, 1427 (Fed.Cir.1991). Rule 56(c) of the Federal Rules of Civil Procedure requires the entry of summary judgment "if the pleadings [and] depositions, ... together with the affidavits ... show that there is no genuine issue as to any material fact...." A fact is material if it "might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The question before us, then, is whether Telesat presented any evidence in opposing summary judgment that created a genuine issue of material fact.
 
 
 12
 * The district court granted the government's summary judgment motion on the APA count on the basis of laches. Telesat delayed three years from the award of the contract before filing suit. The district court deemed this length of time too long, stating that "the plaintiff has slept on its rights."
 
 
 13
 In order to establish laches, the defendant must prove both an unexcused and unreasonable delay, as well as prejudice to the defendant flowing from that delay. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032, 22 USPQ2d 1321, 1328 (Fed.Cir.1992). The type of prejudice may be either economic or evidentiary. Id. The government here does not allege evidentiary, or defense, prejudice; thus our inquiry is directed solely at the economic harm the government suffered as a result of Telesat's three-year delay in filing suit.
 
 
 14
 Economic prejudice supporting laches arises when the defendant will suffer monetarily what it would not have suffered had suit been filed earlier. The damages or losses cannot be "merely those attributable to a finding of liability" for the conduct alleged. Aukerman, 960 F.2d at 1033, 22 USPQ2d at 1329. Some change in the position of the defendant during the period of delay must exist before laches can be found.
 
 
 15
 The government claims that it would suffer "enormous economic prejudice" if the contract were set aside. Appellee's Brief at 27. Such prejudice would flow from 1) disruption of cable television programming to U.S. forces in Panama, and 2) exposure to damages and costs it may have to pay Visat if it terminates Visat's contract for the convenience of the government as a result of Telesat's suit. The government bases these assertions on the affidavits of two of its employees who have had direct dealing with the Visat contract. We agree that the government has alleged sufficient economic prejudice to invoke laches, if indeed serious disruption of cable service would result from setting aside the contract. In contrast, the damages and costs associated with a termination for convenience cannot serve as proof of economic prejudice that would support a laches finding. Such costs and damages do not increase with the passage of time; they in fact diminish with each day of contract performance. Economic prejudice also cannot be premised on the amount the government may have to pay to Telesat if it prevails in this suit. Had Telesat filed the day after its offer was rejected, and consequently had been able to later collect damages for the improper award of the contract, the government would still be liable for those damages. Such damages are "attributable to a finding of liability[,]" Aukerman, 960 F.2d at 1033, 22 USPQ2d at 1329, and cannot give rise to economic prejudice sufficient to invoke laches.
 
 
 16
 Telesat contests the government's assertion of economic prejudice flowing from cable disruption, and claims that the government would suffer no economic prejudice resulting from its filing delay, because there would be no disruption of cable service. To support its claim, Telesat submitted the affidavit of its president, Humberto Fasano. In a very detailed fashion, Fasano outlines his disagreements with the affidavits of the government. While the government avers that significant new hardware would have to be purchased if a new contract were awarded, Fasano contends that the opposite is true. He claims that all that "would be required is that a new computer chip would have to replace the original one in the decoder box allowing the box to decode the frequencies the new contractor would be using. These chips cost approximately five dollars and require no more than fifteen minutes time to install."
 
 
 17
 The government also claims that service will be disrupted due to time needed to re-bid the contract. Telesat disputes this assertion as well, relying on evidence that in December 1990, the Army contemplated conducting a solicitation to replace Visat as a contractor with only a five-day response time for bidders.
 
 
 18
 Here, Telesat asserts that no disruption will occur as a result of re-bidding the programming portion of the contract. Whether disruption will occur is undeniably a material fact, since the government has alleged no additional prejudice that would otherwise entitle it to summary judgment on the basis of laches. Thus, the question becomes whether Telesat submitted sufficient evidence to create a genuine factual dispute.
 
 
 19
 The party opposing summary judgment "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116, 227 USPQ2d 577, 582 (Fed.Cir.1985). Rather than making general or conclusory denials, Telesat has presented evidence which specifically addresses and disagrees with contentions made by the government. It has therefore discharged its burden of proof in opposing the government's summary judgment motion, and established that a genuine issue of material fact thus exists as to whether the government has suffered any prejudice resulting from Telesat's delay. Consequently the entry of summary judgment on Telesat's APA claim was in error, and must be reversed.
 
 B
 
 20
 Telesat alleged that the government breached its obligation under the Tucker Act to consider Telesat's response to the RFP fairly and honestly. In support of this theory, Telesat alleges that a secret meeting took place after the BAFO submission deadline, and at which two of the bidders were not in attendance. No record was ever made of the meeting, nor were Telesat or SES ever notified of its transpiration. The contract was then awarded to Visat, one of the attendees of the meeting. Further, it appears that the government may have known Visat did not have the necessary licenses, and may additionally have known that the likelihood of Visat's obtaining the licenses was slim.
 
 
 21
 Significantly, before the district court the government did not present any evidence to contradict the facts upon which Telesat relies for its Tucker Act legal theory. The government urges us to affirm the dismissal of Telesat's Tucker Act claim because, it claims, the facts upon which Telesat relies are not relevant to the legal theory Telesat advances. The government interprets the evidence concerning Visat's apparent failure to ever obtain appropriate licenses as an attack by Telesat on the administration of the contract, and sees the allegations concerning statements by high-ranking U.S. officials as a proffer by Telesat to excuse its late filing of this suit. Neither of these responses, however, address whether Telesat has alleged sufficient facts to allow it to proceed on its Tucker Act theory.
 
 
 22
 The trier of fact must, in considering summary judgment, view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). A reasonable person could infer from the facts alleged that questionable conduct occurred during the bidding process, and moreover that the alleged misstatements given by high-ranking U.S. officials after the contract award evidence an attempt to shield the earlier conduct from further inquiry. Telesat thereby established a sufficient factual basis to require trial of the bad faith contention. Thus, the district court erred when it granted the summary judgment motion on Telesat's Tucker Act claim.
 
 IV
 
 23
 Telesat claims both a conspiracy to violate, as well as an actual violation of, the Panama Canal Treaty of 1977. Telesat asserts federal court jurisdiction over these claims through the Alien Tort Claims Act, 28 U.S.C. § 1350 (1988), which permits district courts to hear claims "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The district court held, however, that Telesat had not overcome the sovereign immunity hurdle, and dismissed Telesat's Panama Canal Treaty claims. On appeal, the government argues that even if a waiver of sovereign immunity exists, Telesat's claim must still be dismissed because the treaty is not self-executing, and therefore gives Telesat no substantive rights upon which to base a tort claim under 28 U.S.C. § 1350.
 
 
 24
 Telesat posits that a waiver of sovereign immunity is found in section 702 of the Administrative Procedure Act, which states that a cause of action
 
 
 25
 seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States....
 
 
 26
 5 U.S.C. § 702 (1988).
 
 
 27
 Section 702 routinely serves as a waiver of sovereign immunity for suits brought against the government pursuant to 28 U.S.C. § 1331 (1988). See, e.g., Hostetter v. United States, 739 F.2d 983, 985 (4th Cir.1984) (§ 702 waives sovereign immunity where plaintiff seeks non-monetary relief and review of agency action not otherwise provided for). Section 1331 is the federal question jurisdiction statute. It grants the district courts original jurisdiction over "all civil actions arising under the Constitution, law, or treaties of the United States." 28 U.S.C. § 1331. The government was asked at oral argument whether, assuming the Panama Canal Treaty was self-executing, a waiver of sovereign immunity exists through the treaty itself or through a combination of the APA and section 1350. The government responded that "[i]f the Panama Canal Treaty is self-executing, then yes, presumably there would be [a waiver of sovereign immunity]." When further pressed on the issue, and questioned specifically whether, in a non-monetary action, the APA could be used for waiver of sovereign immunity, the government responded, "[y]es, if the treaty provided ... a substantive, private right of action." We understand the government thus to assert that if Telesat can establish that a cause of action exists under the treaty, then a waiver of sovereign immunity is found in section 702 of the APA. We agree, because we discern no distinction between the use of the APA waiver of sovereign immunity for a cause of action under section 1331, on the one hand, and under section 1350 on the other hand, when the plaintiff is possessed of a private right of action. The district court thus erred as a matter of law in dismissing the Panama Canal counts for want of a sovereign immunity waiver. The question is not whether a waiver of sovereign immunity exists for the Panama Canal Treaty counts, but whether the Panama Canal Treaty provides a cause of action that Telesat may pursue under section 1350, which is another way of asking whether the treaty is self-executing.
 
 
 28
 The question of self-execution is one of law. See United States v. Postal, 589 F.2d 862, 876 (5th Cir.1979). The government insists that we must decide this question on appeal. Telesat urges us to permit the district court first to consider and rule on the question, because the record on appeal lacks any detailed proofs concerning the treaty. In order to decide a dispute over whether a particular treaty is self-executing, courts "may look beyond the written words [of the treaty] to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943) (citations omitted). As we are faced with a record devoid of proven factual information on any of these factors, and we are otherwise remanding the case, we decline to decide the self-execution issue now. See Golden Nugget v. American Stock Exchange, 828 F.2d 586, 588 (9th Cir.1987). We thus afford the district court the opportunity to examine the complexities of this issue in the first instance.