Matthew **HERRERA**, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. 96–116 L.

United States Court of Federal Claims.

Oct. 31; 1997.

Stephen T. LeCuyer, Mettler & LeCuyer, P.C., Corrales, NM, for plaintiff.

Daniel G. Steele, U.S. Dept. of Justice, Environment and Natural Resources Division, Washington, DC, for defendant.

## OPINION AND ORDER

HODGES, Judge.

Plaintiff asserts a claim pursuant to Article I of the Fort Sumner Treaty of 1868. The Treaty allows reimbursement for injuries sustained by Indians from persons subject to the authority of the United States. Plaintiff submitted his request for reimbursement in April 1992 to the appropriate agencies, including the Eastern Navajo Agency Superintendent and the Bureau of Indian Affairs. The Assistant Secretary—Indian Affairs denied plaintiff's claim in July 1996. The Assistant Secretary based the agency's decision on Article XIII of the Treaty, which provides that any Navajo Indian who "leaves the reservation and settles elsewhere shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty." Herrera instituted this action on February 27, 1996. The administrative record was filed in September 1996.

■ The issue is whether plaintiff may assert a claim for compensation under Article I of the 1868 Treaty between the Navajo Nation and the United States, where Plaintiff's permanent residence was at Ojo Encino, and where Plaintiff was attacked at Dzilth–Na–O–Dith–Hle. Both locations are in the Eastern Navajo Agency of New Mexico, outside of the boundaries of the Reservation recognized by the 1868 Fort Sumner Treaty.

Articles IX and XII effectively restrict the Treaty rights and privileges of Article I to those Navajo living on a reservation contemplated by Article II of the Treaty. Herrera may only assert a claim for compensation under the Treaty if plaintiff's permanent residence was located within the boundaries of the reservation recognized by the Treaty. Because Herrera did not live on the reservation and the attack occurred outside the reservation's boundaries, Herrera is not entitled to the protections afforded by the Treaty.

## BACKGROUND

Matthew Herrera is a Navajo Indian. At the time of the attack he was 17 years old. His permanent domicile is an allotment of land in Ojo Encino, outside the reservation boundaries. Herrera resided temporarily—Sunday through Thursday—in a school dormitory in Dzilth–Na–O–Dith–Hle, also located outside the reservation boundaries. Herrera's home and school are on land under the control of the Eastern Navajo Agency of New Mexico.

Plaintiff was attacked by Howard Allen on the evening of April 17, 1990. Also a student and resident of the dormitory, Allen is a member of the Jicarilla Tribe. Allen struck plaintiff with an iron bar on plaintiff's body and the back of his head, causing skull fractures, nasal fractures, and other injuries. Allen was placed in the custody of the Navajo police.

Following the attack, plaintiff received treatment at hospitals and rehabilitation facilities of the Eastern Navajo Agency and elsewhere. Some of the injuries sustained from the attack were treatable, but some require ongoing rehabilitation efforts.

Defendant filed a motion to dismiss pursuant to 12(b)(4) of this court, for failure to state a claim upon which relief could be granted. Herrera filed his opposition to defendant's motion to dismiss and a motion for partial summary judgment. We denied defendant's motion to dismiss in April 1997, and defendant filed its opposition to plaintiff's motion in June.

## DISCUSSION

The Treaty provides, in relevant part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States, will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington ... reimburse the injured person for the loss sustained.

Navajo Treaty of June 1, 1868, art. I, 15 Stat. 667. The Treaty also provides:

> [T]he tribes who are parties to this agreement hereby stipulate that they will relinquish all rights to occupy any territory outside their reservation, as [defined in Article II].

*Id.,* art. IX.

> The tribe ... agree[s] to make the reservation, herein described, their permanent home, and they will not as a tribe make any permanent settlement elsewhere ... and it is further agreed and understood by the parties to this treaty, that if any Navajo Indian or Indians shall leave the reservation herein described, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty.

*Id.,* art. XIII.

■ Treaties are to be liberally construed in favor of Indians. *See, e.g., McClanahan v. State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (" '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith' ") (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930)); *Choctaw Nation of Indians v. Unit-*

*ed States,* 318 U.S. 423, 431–432, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943) ("we may look beyond the written word to the history of the treaty, the negotiations, and the practical construction adopted by the parties"). This principle is not unbounded, however. "The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986); *see also DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975) ("[a] canon of construction is not a license to disregard clear expressions of tribal and congressional intent"); *Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 179, 67 S.Ct. 650, 655, 91 L.Ed. 823 (1947) ("[w]hile it has long been the rule that a treaty with Indians is to be construed so as to carry out the Government's obligations in accordance with the fair understanding of the Indians, we cannot, under the guise of interpretation ... rewrite congressional acts so as to make them mean something they obviously were not intended to mean"); *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 353, 65 S.Ct. 690, 699, 89 L.Ed. 985 (1945) ("[w]e stop short of varying [a treaty's] terms to meet alleged injustices. Such generosity, if any may be called for in the relations between the United States and the Indians, is for the Congress"). Indeed, "Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation,* 318 U.S. at 432, 63 S.Ct. at 678.

Courts often have been inclined to undertake an analysis of the history surrounding a treaty even when the ultimate finding is that the terms of the treaty are unambiguous. *See, e.g., Washington v. Washington Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 674–679, 99 S.Ct. 3055, 3068–71, 61 L.Ed.2d 823 (1979), *modified on other grounds,* 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979); *Choctaw Nation,* 318 U.S. at 431–32, 63 S.Ct. at 677–78. However, such an exercise in the present case is unnecessary. The plaintiff seeks to create ambigu-

ity where none exists. The term "reservation" is unambiguous. The loss of rights provision of article XIII of the Treaty is equally unambiguous. It is also clear under article IX that the tribes relinquished all rights to occupy territory outside the reservation contemplated by the agreement. Plaintiff acknowledges that he was not attacked on the reservation and that he did not reside on the reservation. Thus, plaintiff is not protected by the Treaty.

## CONCLUSION

Where the terms of a treaty are unambiguous, they must be given their plain meaning. Plaintiffs motion relies on the historical context of the Treaty and the negotiations that produced it. Even if consideration of those items would lead to an understanding of the Treaty language different from its plain meaning, we should not consider that information absent a finding of ambiguity. Indeed, the considerable amount of historical evidence offered by the parties establish the difficulty of divining the understanding or intentions of the parties to the Fort Sumner Treaty. Herrera essentially argues that he is entitled to the benefits of the Treaty because his ancestors believed that the Treaty would encompass the territory in which Herrera was attacked. Such a speculative argument cannot affect the decision in this case.

Plaintiff's motion for partial summary judgment is DENIED. Having found no factual dispute material to the question of whether plaintiff may recover under the Treaty, we enter judgment for defendant. The Clerk will dismiss plaintiff's claim. No costs.